## DOCKET NO.: 20-14047-CC

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

### F.E.B. CORP., a Florida Corporation,

Appellant,

v.

### UNITED STATES OF AMERICA,

Appellee.

---

On Appeals from the United States District Court
for the Southern District of Florida
Case No.: 18-10203-civ-Martinez

---

### CORRECTED
### APPELLANT'S INITIAL BRIEF

---

**TARA A. CAMPION**
**BRUCE S. ROGOW, P.A.**
1199 S. Federal Hwy., #212
Boca Raton, FL 33432
PH: 954.767.8909

**BRUCE S. ROGOW**
**BRUCE S. ROGOW, P.A.**
P.O. Box 749
Cedar Mountain, NC 28718
PH: 954.767.8909

20-14047-CC
*U.S. v. F.E.B. Corp.*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-2(b), undersigned counsel hereby certifies that no corporation or publicly held corporation owns 10% or more of F.E.B. Corp.'s stock,  and the following is a complete list of all persons and entities known to have an interest in the outcome of this appeal:

1. Bruce S. Rogow, P.A. – Counsel for the Appellant

2. Campion, Tara A. – Counsel for the Appellant

3. Erickson-Pogorzelski, Anthony – Trial Counsel for the Appellee

4. F.E.B. Corp. – Appellant

5. Grey, Michael – Appellant Counsel for the Appellee

6. Rogow, Bruce S. – Counsel for the Appellant

7. United States of America – Appellee

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Oral argument will assist the Court in this case. The question presented turns on the meaning of, and application of, an exception to the Submerged Lands Act (SLA). As in most cases involving statutory analysis, linguistics, grammar, historical usage, legislative history and the historical treatment of the subject phrase by those charged with discerning its meaning, are the keys to resolving the dispute presented here. Argument, and questioning of counsel, will be helpful.

The need for oral argument is bolstered by the fact that the question presented – application of a specific Submerged Lands Act exception to a unique circumstance – has been the subject of a "dicta" comment in the predecessor-to-this-appeal. *See F.E.B. Corp. v. United States*, 818 F.3d 681, 689-90, n. 9, 10 (11th Cir. 2016) (*F.E.B. I*). The Government relied on that dicta. Doc 35, pp. 11-12.[1] The record in this case is significantly different. This Court is not bound by its prior dicta. *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010). The meaning of the Submerged Lands Act exception at issue here deserves the close scrutiny of oral argument in the effort to determine whether the language, legislative history and historical treatment of the subject exception support the decision below.

_____

[1]    Pursuant to 11th Cir. R. 28-5, references to the record appearing in this Initial Brief are to the document and page number that appear in the header generated by the district court's electronic filing system, i.e. "Doc __, p. __."

i

## <u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT ............................................ C1

STATEMENT REGARDING ORAL ARGUMENT ................................................ i

TABLE OF CITATIONS ........................................................................... iv

STATEMENT OF JURISDICTION ............................................................... 1

STATEMENT OF THE ISSUES ................................................................... 1

STATEMENT OF THE CASE ...................................................................... 2

      A. The District Court Order (Facts) .............................................. 4

      B. The District Court Order (Analysis) ........................................... 6

SUMMARY OF THE ARGUMENT ................................................................. 8

STANDARD OF REVIEW .......................................................................... 11

ARGUMENT: THE DECISION BELOW SHOULD BE REVERSED AND
TITLE QUIETED IN FAVOR OF F.E.B. CORP. .................................................. 11

   I.   CONFRONTING THE DICTA: *CALIFORNIA II* AND *F.E.B. I*
       DICTA DO NOT DETERMINE THIS CASE ......................................... 11

  II.   THE LAWS OF LANGUAGE DETERMINE MEANING; THE
       STRIKING OF F.E.B.'S EXPERTS WAS REVERSIBLE ERROR ....... 17

  III.  DREDGING IS NOT A USE; A DREDGE SPOIL IS NOT AN
       IMPROVEMENT OR AN ACCRETION. THE LEGISLATIVE
       HISTORY SUPPORTS F.E.B.'S "FOR ITS OWN USE"
       STATUTORY INTERPRETATION ...................................................... 31

      A. The Statute's Plain Language ..................................................... 31

      B. The Legislative History ............................................................. 33

IV.     THE NAVY UNDERSTOOD THE DREDGE SPOIL ISLAND WAS
        NOT CREATED "FOR ITS OWN USE" .....................................................38

 V.     THE SUBJECT PROPERTY IS NOT ALL DREDGE SPOILS.
        SUMMARY JUDGMENT AS TO ALL 39 ACRES WAS ERROR ...........45

CONCLUSION .........................................................................................48

CERTIFICATE OF COMPLIANCE.......................................................49

CERTIFICATE OF SERVICE ................................................................49

## <u>TABLE OF CITATIONS</u>

### <u>Cases</u>

*Aspilaire v. U.S. Attorney General*,
    992 F.3d 1248 (11th Cir. 2021) ....................................................................8

*Bailey v. United States*,
    516 U.S. 137, 116 S.Ct. 501 (1995)..................................................8, 9, 18, 19

*Black Warrior Riverkeeper, Inc. v. Black Warrior Minerals, Inc.*,
    743 F.3d 1297 (11th Cir. 2013) ..................................................................32

*Borden v. United States*,
    No. 19-5410, 2021 WL 2367312 (June 10, 2021)......................................... 8

*California ex. rel. State Lands Comm'n v. United States* (*California II*),
    457 U.S. 273, 102 S.Ct. 2432 (1982)................................6, 11, 12, 13, 14, 15

*Commodores Entertainment Corp. v. McClary*,
    879 F.3d 1114 (11th Cir. 2008) ..................................................................26

*Consolidated Rail Corporation v. Grand Trunk Western Railroad Company*,
    2011 WL 6004572 (S.D. Mich. 2011) ..........................................................30

*District of Columbia v. Heller*,
    554 U.S. 570, 128 S.Ct. 2783 (2008)..........................................24, 25, 27, 28

*Edwards v. Prime, Inc.*,
    602 F.3d 1276 (11th Cir. 2010) ....................................................................i

*Ellis v. England*,
    432 F.3d 1321 (11th Cir. 2005) ..................................................................11

*F.E.B. Corp. v. United States* (*F.E.B. I*),
    818 F.3d 681 (11th Cir. 2016) .............................................................*passim*

*Goncharenko v. Royal Caribbean Cruises, Ltd.*,
    743 Fed. Appx. 645 (11th Cir. 2018)......................................................... 11

*McNely v. Ocala Star-Banner Corp.*,
    99 F.3d 1068 (11th Cir. 1996) .........................................................................16

*Muscarello v. United States*,
    524 U.S. 125, 118 S.Ct. 1911 (1998)................................................7, 8, 9, 17

*Newfound Management Corporation v. Sewer*,
    34 F.Supp.2d 305 (D. VI. 1999) ....................................................................30

*Parker Drilling Management Services, Ltd. v. Newton*,
    139 S.Ct. 1881, 204 L.Ed.2d 165 (2019) ........................................................9

*Pope v. Blandon*,
    10 F.Supp. 18 (N.D. Fla. 1935) .....................................................................39

*Smith v. United States*,
    508 U.S. 223, 113 S.Ct. 2050 (1993)..............................................................18

*Star Athletica, L.L.C. v. Varsity Brands, Inc.*,
    137 S.Ct. 1002, 197 L.Ed.2d 354 (2017).......................................................19

*United States v. Morton*,
    467 U.S. 822, 104 S.Ct. 2769 (1984)..............................................................32

*United States v. Ron Pair Enterprises, Inc.*,
    489 U.S. 235, 109 S.Ct. 1026 (1989)........................................................33, 34

*United States v. United States Gypsum Co.*,
    333 U.S. 364, 68 S.Ct. 525 (1948)..................................................................48

## Statutes

Title 43 U.S.C. §1311 .......................................................................*passim*

Title 43 U.S.C. §1313(a)...................................................................*passim*

## Rules

Fed. R. Evid. 702 .......................................................................................26, 27

v

Fed. R. Evid. 704 ...............................................................................23, 24

## Additional Sources

Robert Katzman, *Response to Judge Kavanaugh's Review of Judging Statutes*, 129 Harv. L. Rev. F. 388 (2016).............................................................17

Thomas R. Lee and Stephen C. Mouritsen, *Judging Ordinary Meaning*, 127 Yale L.J. 788 (2018) ..........................................................................25

## STATEMENT OF JURISDICTION

This is an appeal from a final judgment entered on an Order Granting Summary Judgment to the United States, quieting title to the United States. This Court has jurisdiction pursuant to Title 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

The first issue presented is the interpretation of the 1953 Submerged Lands Act, Title 43 U.S.C. §1313(a) exception which reserves for the United States "all lands filled in, built up, or otherwise reclaimed by the United States for its own use," as applied to an island off the shore of Key West, Florida. The Island came into being as a consequence of naval dredge spoils.

The Government agreed that the resolution of this case turns on the construction of the "for its own use" exception to the Submerged Lands Act. It's Motion for Summary Judgment [Doc 35] stated:

> Accordingly, this case is resolved upon answering the following question: was the Subject Property excepted from the SLA under § 1313(a) because it was filled in or built up by the United States for its own use.

*Id*. at 3. The court below said it was. But the language, the legislative history, and the Government's contemporary views of the application of the exception compel a different answer.

The second issue is whether the court erred in striking F.E.B.'s "linguists, legal lexicographers, and grammarians" as "not relevant experts" because

1

"[s]tatutory interpretation [was] within the exclusive purview of the Court." Doc. 67, pp. 8-9. The final issue is whether summary judgment was proper regarding certain submerged lands adjoining the dredge spoil island; lands that were not created by the spoil.

## STATEMENT OF THE CASE

This is an appeal from an "Order Granting Plaintiff's [the United States] Motion for Summary Judgment and Denying Defendant's [F.E.B. Corp.] Motion for Summary Judgment," and granting the United States' Motion to Strike F.E.B.'s Expert Witnesses. Doc 67. The appeal also seeks review of the Order Denying "F.E.B. Corp.'s Renewed Motion Pursuant to Rule 59(e) to Alter or Amend Order Granting Plaintiff's Motion for Summary Judgment and Motion Pursuant to Rule 60 Seeking Relief from the Judgment." Doc 86. A final Judgment was entered on August 28, 2020.

This is the second time F.E.B. and the United States have been to this Court seeking resolution of a title dispute relating to a small island and surrounding property off the shore of Key West, Florida. The property – 21 acres of spoil land and 18 acres of submerged land – is known as Wisteria Island. In *F.E.B. Corp. v. United States*, 818 F.3d 681 (11th Cir. 2016) (*F.E.B. I)*, the Court held that the Quiet Title Act's (QTA) statute of limitations precluded F.E.B.'s action, but opened the door to subsequent litigation to resolve ownership of the property:

2

> For the foregoing reasons [the QTA], we AFFIRM the district court's dismissal of the case for lack of subject matter jurisdiction. In doing so, we note that the dismissal "does not quiet title to the property in the United States. The title dispute remains unresolved." *Block* [*v. North Dakota ex. rel. Bd. of University and School Lands*], 461 U.S. [273] at 291, 103. S.Ct. 1811.

*Id*. at 639-694. The Court did offer some passing thoughts on the question in this appeal, framing the issue which is squarely presented now: "[o]f course, in ruling on the statute of limitations question, we do not dispositively rule on the merits of F.E.B.'s SLA [Submerged Lands Act] claim, including as to whether using the island as a place to store fill constitutes 'use' under the relevant SLA exception." *Id*. at 689. The SLA, Title 43 U.S.C. §§ 1301-1315 (1953), confirmed that the States had title to and ownership of lands beneath navigable waters within three miles of their shores. The "relevant exception" here is for "all lands filled in, built up, or otherwise reclaimed by the United States for its own use." 43 U.S.C. §1313(a).

There are several issues presented.

First, whether the dredge spoils deposited by the Navy on what became known as "Wisteria Island" was within the exception; in other words, did a mere deposit of dredge spoils fall within the "for its own use" meaning given grammatical usage, legislative history, and the historical understanding evidenced by the Navy itself that Wisteria did not fall within the exception. Second, did the court below err in excluding expert testimony which would have aided in the interpretation of the

3

language at issue, and third, should summary judgment have been entered on the portion of the 39 acres which was not a dredge spoil, but submerged lands?

## A.    **The District Court Order (Facts)**

Both parties moved for summary judgment. The court below accurately set forth the following facts.

> The island in question, known as Wisteria Island (or "the island"), is situated in the Gulf of Mexico, less than a mile off the coast of Key West, Florida. It is not a natural island, but rather was formed as a result of dredging operations performed under the auspices of the United States Navy ("Navy") in nearby Key West Harbor during the first half of the nineteenth century. As Navy contractors deepened the channels in the harbor to improve shipping and aviation access, they deposited the dredged material on a nearby plot of submerged land. The accumulations eventually rose above sea level. A substantial dredging project in 1943 made the thirty-nine-acre (later-named) Wisteria Island what it is today.[2]
>
> In 1951, the state of Florida issued notice of its intention to sell Wisteria Island. The United States objected to the sale of the island on the grounds that the island belonged to the United States. In a letter to the state, the United States traced its ownership of the island and surrounding area to an 1819 treaty with Spain, as confirmed by subsequent 1845 and 1924 Executive Orders. The United States concluded, "In view of the foregoing [Florida is] informed that the Department of the Navy considers . . . the spoil area in question as being the property of the United States. It is, therefore, requested, that no further action be taken . . . to dispose of the spoil area in question by sale or otherwise."

---

[2]      Only a portion of the 39 acres are "island."

In his own letter to the state, Florida's attorney general acknowledged the United States' claim, but expressed doubt as to its validity, opining:

> I am unable to state definitively whether or not the Navy's claim is valid. However, I do think that the claim is debatable enough and so shrouded in antiquity that I think the best course would be for [Florida] to complete the sale and explain the Navy's claim to [the buyer] and allow him to accept the … deed at his own risk . . . . In this manner we can get the question of title settled one way or other in case the Navy decides to litigate with him.

Accordingly, in 1952, Florida sold the island to a private party via a quitclaim deed that contained no warranties of title.

One year later, Congress enacted the Submerged Lands Act ("SLA"), 43 U.S.C. §§ 1301–1315, which, broadly speaking, granted the states ownership of submerged lands within three miles of their coastlines, subject to certain exceptions. In the years that followed, the United States did not reassert its claim to Wisteria Island. Title passed from private owner to private owner until F.E.B. acquired the island in 1967. The federal government appeared to acquiesce to F.E.B.'s ownership, and even entered into licensing agreements with F.E.B. to use the island as a Navy training ground from 2004 to 2006.

In 2011, however, the United States once again asserted ownership over Wisteria Island. F.E.B. filed . . . suit under the Quiet Title Act ("QTA"), 28 U.S.C. § 2409a, to establish ownership of the island . . . . The district court, however, did not reach the merits of F.E.B.'s SLA claim in this quiet title action.

Doc 67, pp. 2-3.

5

The district court dismissed F.E.B.'s quiet title action on statute of limitations grounds, leading to this Court's affirmance in *F.E.B. I, supra*.

## B.    The District Court Order (Analysis)

Proceeding from the premise that "Wisteria Island 'was filled in' as a spoil deposit in conjunction with a dredging project in Key West Harbor from 1941-1943 conducted under the auspices of the Navy," the court below saw its "only" task to be to determine whether the island's incidental but deliberate creation was "'for its own use.'" Doc 67, p. 5.

In doing so, the court wrote: "Applying the plain words of the statute, as they are commonly and ordinarily understood, [the] Court concludes that the filling in of a spoil area to facilitate naval dredging operations counts as 'lands filled in . . . by the United States for its own use.' *Id*. §1313(a)." *Id*. The court concluded, writing that its "conclusion is fortified by the Eleventh Circuit's precedent in *F.E.B. I*," quoting extensively this Court's dicta, which in turn had quoted the Supreme Court's dicta in *California ex. rel. State Lands Comm'n v. United States*, 457 U.S. 273 (1982) (*California II*). Doc 67, pp. 5-6.

Beyond that, the court below concluded that legislative history supported its conclusion, and "reject[ed] the expert testimony" of the "[l]inguists, legal lexicographers, and grammarians" offered by F.E.B. who explained that "the word 'for' within the phrase 'filled in . . . for its own use contemplates use beyond filling

in, and that 'creation is not use' according to lexical meaning." *Id*. at 8. There is no dispute that the Navy did not "use" the island (other than to actually lease it from F.E.B. in later years (Doc 38-50), but the court below was not persuaded: "Dredging was the use." Doc 67, p. 9.

***

This appeal challenges the district court's conclusion on several fronts. First, its reliance on this Court's dicta which itself relied upon Supreme Court dicta; second, the disregard of the legislative history which does not embrace the notion that a dredge spoil, and especially this dredge spoil, was a "use" under the §1313(a) exception; third, the failure to acknowledge and consider that the Navy, at the time of the dredging and subsequent to it, did not read "for its own use" as having created a Navy property and indeed had resorted to condemnation to secure ownership of Wisteria and adjoining properties, and had leased Wisteria, a fact plainly inconsistent with ownership; and finally, the district court's refusal to even consider experts in language, striking them, with the simple statement that "statutory interpretation is within the exclusive purview of the Court." *Id*. at 8 and n.2.

While statutory interpretation is for the court, a court cannot close its eyes to linguistic principles which are relevant to a statute's interpretation. *Compare*, *Muscarello v. United States*, 524 U.S. 125, 118 S.Ct. 1911 (1998):

7

> We begin with the statute's language. The parties vigorously contest the ordinary English meaning of the phrase "carries a firearm." Because they essentially agree that Congress intended the phrase to convey its ordinary, and not some special legal, meaning, and because they argue the linguistic point at length, we too have looked into the matter in more than usual depth.

*Id*. at 127-128. Looking into "for its own use" required a linguistic analysis, not the striking of those who could assist that analysis. *See*, *infra*, at 17, discussing the importance of properly examining statutory language, as the Supreme Court has repeatedly done, even as recently as June 10, 2021 in *Borden v. United States*, No. 19-5410, 2021 WL 2367312, at *8 (June 10, 2021) ("the interplay of 'use' and 'against'").

But first we must address this Court's dicta in *F.E.B. I*.  That dicta too, did not have the benefit of linguistic analysis. We provide that in depth below.

## <u>SUMMARY OF THE ARGUMENT</u>

The word "use" in federal statutes has bedeviled courts before. *Bailey v. United States*, 516 U.S. 137, 116 S.Ct. 501 (1995); *Smith v. United States*, 508 U.S. 223, 113 S.Ct. 2050 (1993); see also *Aspilaire v. U.S. Attorney General*, 992 F.3d 1248, 1257 (11th Cir. 2021), quoting *Bailey*, 516 U.S. at 145, "'[t]he ordinary meaning[] of the word[] 'use['] … connote[s] activity beyond simple possession.'"

Here, the question is what does "for its own use" mean in the context of the 1953 Submerged Lands Act. The Act "ceded to the coastal States offshore lands

8

within a specified distance of their coasts." *Parker Drilling Management Services, Ltd. v. Newton,* 139 S.Ct. 1881, 1887, 204 L.Ed.2d 165 (2019).  It assured states ownership of their submerged lands except for "lands filled in, built up, or otherwise reclaimed by the United States for its own use." Put another way, the question is whether "for its own use" means something more than the dumping and discarding of spoil; does it mean that the land formed by the spoil must have been intended to be used beyond its mere incidental formation?

The Supreme Court has said "the word 'use' poses some interpretational difficulties because of the different meanings attributable to it." *Bailey*, 516 U.S. at 143. In *Bailey* the Court "look[ed] not only to the word but also to the statute. . . ." In *Muscarello v. United States*, 524 U.S. 125, 118 S.Ct. 1911 (1998) where "uses or carries a firearm" was in play, the Court, focusing on "carry," looked to dictionaries, etymology, linguistics, legislative discussions. *Id*. at 127-132.

A similar mode of inquiry in this case leads to the conclusion that "for its own use" means more than the placing of dredge spoil and the incidental creation of "land."  The trial court's construct was: "Creation was not the use. Dredging was the use." Doc 67, p. 9. That construct is at odds with plain language, and not supported by the legislative history of the exception or historical Navy understanding of "for its own use" as it applied to the dredge spoils here.

9

Given the plain meaning of "for its own use," the linguistics and grammar of the phrase, and the phrase's legislative history, there is no doubt that it was actual improvements and accretions to government installations which generated the "for its own use" exception. The understanding of the phrase by those charged with responsibility for the Key West offshore area, and the subsequent understanding of the State public officers and officials who collected taxes on the property, and the Navy who leased it from F.E.B., confirm the understanding that Wisteria was not formed to be used by the United States; it was an incidental byproduct of a channel dredging.

This Court acknowledged that its comments in *F.E.B. v. United States*, 818 F.3d 681 (11th Cir. 2016) (*F.E.B. I*) relating to the "for its own use" exception to the Submerged Lands Act was "dicta," and that the Supreme Court's discussion of the exception was also "dicta." *Id*. at 690, n.10. We recognize that, as this Court said, "there is dicta . . . and then there is Supreme Court dicta" (*id*.) but this case must be decided by more than "dicta." The language tools which govern usage of words and phrases, as well as legislative intent and on the ground historical application, require assessing "for its own use" not *via* dicta, but by a careful review on the merits.

The decision below should be reversed.

10

## STANDARD OF REVIEW

The standard of review of an Order Granting Summary Judgment is *de novo*. See *Circuitronix, LLC v. Kinwong Electronic (Hong Kong) Co., Ltd.*, 993 F.3d 1299, 1303 (11th Cir. 2021). "We review *de novo* the district court's grant of a motion for summary judgment, considering all of the evidence and the inferences it may yield in the light most favorable to the nonmoving party." *Ellis v. England*, 432 F.3d 1321, 1325 (11th Cir. 2005). A trial court's "decision to admit or exclude expert testimony" is reviewed for abuse of discretion. *Goncharenko v. Royal Caribbean Cruises, Ltd.*, 743 Fed. Appx. 645, 646 (11th Cir. 2018).

## ARGUMENT

### THE DECISION BELOW SHOULD BE REVERSED AND TITLE QUIETED IN FAVOR OF F.E.B. CORP.

### I
### CONFRONTING THE DICTA:
### *CALIFORNIA II* AND *F.E.B. I* DICTA DO NOT DETERMINE THIS CASE

This Court, in the prior case, described the Wisteria creation:

> The island in question, known as Wisteria Island (or "the island"), is situated in the Gulf of Mexico, less than a mile off the coast of Key West, Florida. It is not a natural island, but rather was formed as a result of dredging operations performed under the auspices of the United States Navy ("Navy") in nearby Key West Harbor during the first half of the nineteenth century. As Navy contractors deepened the channels in the harbor to improve shipping and aviation access, they deposited the dredged material on a nearby plot of submerged land. The accumulations eventually rose above sea level. A substantial dredging

11

> project in 1943 made the thirty-nine-acre (later-named)
> Wisteria Island what it is today.

*F.E.B. Corp. v. United States*, 818 F.3d 681, 684 (11th Cir. 2016) (*F.E.B. I*).

Not every day does an appellate litigant have to dispel dicta (or as the Court noted, dicta on dicta.).[3] But we take on that task. We explain that: (1) *California II* and the SLA "for its own use" language does not support a conclusion that dredge spoils lead to Government ownership; (2) the SLA legislative history and its application to the unique Wisteria formation supports F.E.B. ownership; (3) the Navy's understanding of the SLA as applied to Wisteria, both in terms of officials' interpretation of "for its own use" and the need for "takings" litigation and permission to "use" Wisteria by leasing it, confirms F.E.B.'s position; (4) linguistic principles compel the conclusion that "for its own use" means to actually use in the future, as distinguished from mere creation.

The Quiet Title panel left this issue open: "Of course, in ruling on the statute of limitations question, we do not dispositively rule on the merits of F.E.B.'s SLA

---

[3]     Speaking of the only case that had ever addressed the "for its own use" language – *California ex rel. State Lands Comm'n v. United States*, 457 U.S. 273, 102 S.Ct. 2432 (1982) (*California II*), this Court noted: "Although *California II's* discussion of the exception is dicta, 'there is dicta … and then there is Supreme Court dicta.'" 818 F.3d at 690, n. 10 (internal citation omitted).

claim, including as to whether using the island as a place to store fill constitutes 'use' under the relevant SLA exception." *F.E.B. Corp. v. United States*, 818 F.3d at 689.[4]

Nevertheless, the Court, writing that land grants must be clear, opined that "the circumstances of Wisteria Island's formation hew closely enough to the 'for its own use' exception" and looked to *California II* for support:

> That conclusion comports with the Supreme Court's only treatment of the exception. . . . In *California II*, the Supreme Court stated in dicta that the SLA exception for land built up by the United States "for its own use" would apply to coastline that had slowly accreted after the United States constructed jetties nearby, even though the accretion was inadvertent, and the resulting coastline had remained barren and unused for the first eight years of its existence. . . . That result, the Supreme Court reasoned, "follow[ed] from the congressional object to assure each sovereign the continuing benefit of landfill and like work performed by each."

*Id*. at 689-690 (internal citations omitted).

That the *California II* "for its own use" comments were dicta is clear. *California II* was an "accretion" case: "[a]pplying the federal rule that accretions, regardless of cause, accrue to the upland owner, we conclude that title to the entire disputed land in issue is vested in the United States." 457 U.S. 273 at 285. In fact "§

---

[4]    The district court made no finding that Wisteria was used to "store fill." Storage is defined as "the putting and keeping of things in a special place for use in the future." Available at:
https://dictionary.cambridge.org/us/dictionary/english/storage
    There is no evidence that the Navy intended any future use of the spoil it deposited at Wisteria.

13

5(a) of the Act expressly withholds from the grant to the States all 'accretions' to lands reserved by the United States, and both California and the United States agreed that the exposure of the formerly submerged lands in dispute constitutes 'accretion.'" *Id*. at 287. So *California II* had no occasion to decide anything more than that. The Supreme Court's "continuing benefit of landfill" supposed intent of Congress *dicta* presents another facet which helps F.E.B.: "landfill" is "a system of trash and garbage disposal in which the waste is buried between layers of earth to build up lowlying land."[5] Dredge spoils are not "landfill."

The Supreme Court dicta touching on the §1313(a) exception is consistent with the legislative intent and purpose of the exception. The accretions were to an active military shore installation: piers and jetties had been built on the filled land.

The Supreme Court's comments aside, that accretions, if viewed as "made," could fall within "all lands filled in, built up, or otherwise reclaimed by the United States for its own use" (*id*. at 287) was the foundation for *F.E.B. I* panel's dicta that Wisteria "was both created and used for a more functional purpose than the inadvertent accretions at issue in *California II*." 818 F.3d at 690. There was no occasion for the Supreme Court or this Court to decide, or even to comment on dredge spoils. Nevertheless, the panel opinion added to its dicta this footnote:

---

[5]     Available at https://www.merriam-webster.com/dictionary/landfill

14

> In addition, the conclusion is consistent with the SLA's legislative history, which shows that Congress added the exception in response to the Navy's concern that the SLA would strip it of submerged lands that it had "improved." *See Submerged Lands: Hearings on S.J. Res. 13, S. 294, S. 107, S. 107 Amend. Before the S. Comm. on Interior and Insular Affairs*, 83rd Cong. 544–556 (1953) (statement of Robert B. Anderson, Secretary of the Navy). The Navy specifically listed "fill" as one of the "improvements" at Key West Naval Station that it sought to shield from the SLA. *Id*. at 547, 549–50.

*Id*. at n. 9.

We address the Secretary Anderson reference and the legislative history in detail *infra* at 33-38. But a closer and careful reading of just the "list" leaves no doubt that Secretary Anderson was not referring to Key West offshore dumped dredge spoils when the reference to "fill" was made.[6]

---

[6]    We are mindful of the principle "that land grants are construed favorably to the Government, that nothing passes except what is conveyed in clear language, and that, if there are doubts, they are resolved for the Government, not against it." *United States v. Union Pac. R. Co.*, 353 U.S. 112, 116, 77 S.Ct. 685 (1957), cited by the Court in *F.E.B. I* at 689.  We are mindful of this Court's statements, in the quiet title context, that the SLA "'release[d] and relinquish[ed]" the United States interest in submerged lands "'except as otherwise reserved [t]herein'" and that there was a "purpose" – "storing" of fill – in the creation of Wisteria. *Id*. at 688-689. But "storing" of fill is not "filled in." "Storing" of fill is not "built up." "Storing" of fill is not an "improvement." Beyond that, "filled in" means "to put material in a hole, trench  or  space  so  that  it  is  completely  full."  Available  at: https://www.google.com/search?q=filled+in+definition&rlz=1C1ZCEB_enUS844US844&oq=filled+in+de&aqs=chrome.1.69i57j0l2j0i22i30l7.5245j1j7&sourceid=chrome&ie=UTF-8
Dumping of dredge spoils is not "filled in."

15

The takeaway from the dicta on dicta is this: (1) "created and used" is not the language of the SLA; (2) Wisteria Island is not the product of "fill," nor is "fill" an "improvement" at the Key West Naval Station; and (3) the legislative history did not embrace dredge spoils as an "improvement" at the Key West facility.

This Court now has historical documents from Government archives that were not in the record of the prior case, including one from the Commander of the Key West Naval base, after two years of investigation relating to the application of the §1313(a) exception to Wisteria (and other similarly created spoil islands), which expressly stated that Wisteria had not been filled in by the Government for its own use. See pp. 33-38, *infra*.

Where there are new facts and evidence in the record the Court is not required to follow dicta in a prior decision. *McNely v. Ocala Star-Banner Corp.,* 99 F. 3d 1068, 1077 (11th Cir. 1996). "For its own use" requires a fresh look that focuses on dredge spoil and the rules which apply to the interpretation of "for its own use."

## II
## THE LAWS OF LANGUAGE DETERMINE MEANING;[7]
## <u>THE STRIKING OF F.E.B.'S EXPERTS WAS REVERSIBLE ERROR</u>

As does the Supreme Court in cases where "meaning" is at issue, "[w]e start – with the statute's language." *Muscarello v. United States*, 524 U.S. 125, 127 (1998). In *Muscarello*, how to interpret "carries a firearm" led to a search for meaning which considered the meaning, origin and uses of "carries," (as in "carries a firearm") – looking to dictionaries, the Bible, celebrated authors, newspapers, press usage, searching of computerized vehicles, looking "for sentences in which the words 'carry,' 'vehicle,' and 'weapon' (or variations thereof) all appear." *Id*. at 127-132.

The *Muscarello* dissent offered its own litany of sources to counter the majority (*id*. at 140-144, and notes 2-6), concluding that "[t]hese and the Court's lexicological sources demonstrate vividly that 'carry' is a word commonly used to convey various messages." *Id*. at 144.  Here, the inquiry is how to interpret "filled

---

[7]    How to judge statutes generates interesting views. *See*, (the late) Robert Katzman, *Response to Judge Kavanaugh's Review of Judging Statutes*, 129 Harv. L. Rev. F. 388 (2016). Judge Katzman noted that "In his review, Judge Kavanaugh also begins what I believe will be an important discussion of the role of cannons in statutory interpretation, a subject that has generated renewed interest following the publication of Justice Scalia and Professor Bryan Garner's significant treatise *Reading Law*." *Id*. at 396. Bryan Garner was one of the experts whose opinion was improperly excluded here.

in, built up . . . for its own use." "For" is a word commonly used to convey a future act or purpose.

"*For*" means "used to indicate the place someone or something is going to or toward; used to indicate the thing that something is meant to be used with."[8] Also, "stating purpose or object or action."[9] "Own" means "belonging to oneself or itself; to have power or mastery over."[10] The noun "*use*" means "to put something such as a tool, skill, or building to a particular purpose."[11]

The Supreme Court grappled with "use" in *Bailey v. United States*, 516 U.S. 137, 116 S.Ct. 501 (1995), a firearms case. The discussion has utility here.

> The word "use" in the statute must be given its "ordinary or natural" meaning, a meaning variously defined as "[t]o convert to one's service," "to employ," "to avail oneself of," and "to carry out a purpose or action by means of." *Smith*, *supra*, at 228–229, 113 S.Ct., at 2054 (internal quotation marks omitted) (citing Webster's New International Dictionary of English Language 2806 (2d ed.1949) and Black's Law Dictionary 1541 (6th ed.1990)). These various definitions of "use" imply action and implementation. See also *McFadden*, 13 F.3d, at 467 (Breyer, C. J., dissenting) ("[T]he ordinary meanings of the words 'use' and 'carry' ... connote activity beyond simple possession").
>
> We consider not only the bare meaning of the word but also its placement and purpose in the statutory scheme. " '[T]he meaning of statutory language, plain or not,

---

[8] Available at https://www.merriam-webster.com/dictionary/for

[9] Available at https://www.macmillandictionary.com/us/dictionary/american/for

[10] Available at https://www.merriam-webster.com/dictionary/own

[11] Available at: https://dictionary.cambridge.org/us/dictionary/english/use

depends on context.' " *Brown v. Gardner*, 513 U.S. 115, 118, 115 S.Ct. 552, 555, 130 L.Ed.2d 462 (1994) (citing *King v. St. Vincent's Hospital*, 502 U.S. 215, 221, 112 S.Ct. 570, 574, 116 L.Ed.2d 578 (1991)). Looking past the word "use" itself, we read § 924(c)(1) with the assumption that Congress intended each of its terms to have meaning.

*Id*. at 145.

*Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 137 S.Ct. 1002, 1010, 197 L.Ed.2d 354 (2017) stated: "[i]nterpretation of a phrase of uncertain reach is not confined to a single sentence when the text of the whole statute gives instruction as to its meaning." *Id*.  F.E.B. sought to place the meaning of the statute before the court. The phrase is an "exception" reflecting a special situation. As the expert opinions stated, if "filled in" or "built up" was the whole ball game, there would be no need to add "for its own use."

"Own" means to exclusively control or possess. The legislative history shows that the use of "own" was placed in the exception to cover military installations owned and occupied by the Government and *in use on filled lands* below the mark of high water. In 1942, the Navy received an opinion that islands, such as Wisteria, created by naval dredging would be sovereign lands of Florida. Doc 38-6.  Knowing this, the Navy did not ask for a deed to Wisteria (as it did in other spoil areas created by the 1940's dredging); did not build a seawall or secure the perimeter of the island, nor any part thereof, preparing it for use, as it did other spoil areas it took title to. (Doc 38-12, pp. 80-81; Doc 38-13, pp. 2-3). For over 60 years the Navy has allowed

19

the State of Florida TIIF and F.E.B. and its predecessors in title, to possess, use and pay taxes on Wisteria. This was not, for the Navy, an "own" use.

Linguistics is important in determining how "for its own use" must be viewed. F.E.B. offered two experts: Bryan Garner and Barry Schein. Doc 38-44; Doc 38-45. The latter, a Professor of Linguistics at the University of Southern California; the former a respected grammarian and legal lexicographer whose writings are source material in many legal settings.

Bryan Garner had this to say about how to read "for its own use:"

> As a textual matter, the question is whether *for its own use* means the land must have been created for the purpose of using it, or whether its incidental creation is use enough to satisfy the exception. (Emphasis in original).
>
> ***
>
> 8.      The particular land at issue here is Wisteria Island – a 39-acre "spoil island" off the coast of Key West. Does the language of §1313(a) contemplate one event (creation of the island) or two events (creation and use of the island)? If the answer is one, then the Government owns the island; if the answer is two, then the §1313(a) exception applies to the property, favoring F.E.B.'s ownership.
>
> 9.      If the Government's position were correct, then the phrase *for its own use* could have been excluded from the statute with no loss in meaning. That is, Wisteria *was filled in, built up, or otherwise reclaimed by the United States.* But the statute doesn't end there; instead, the words *for its own use* appear at the end of the clause. According to the surplusage canon, "[i]f possible, every word and every provision is to be given effect. . . . None should be ignored." *The only way to give meaning to for its own use*

20

*is to understand that filling in and building up are one event (creation), and using is a different event.* The island must be actually used in some way to fall within the statutory exception. (Internal citations omitted).

Doc 38-44, pp.3-4.  Garner continued:

> 12.    There is a further question whether *use* means at any time in the future or whether the word inherently denotes some temporal restriction. The most pertinent meanings in the 11th edition of *Black's Law Dictionary* are senses 1 and 3. Sense 1: "The application or employment of something; esp., a long-continued possession and employment of a thing for the purpose for which it is adapted, as distinguished from a possession and employment that is merely temporary or occasional <the neighbors complained to the city about the owner's use of the building as a dance club> ." Sense 3: "A purpose or end served <the tool had several uses>." The *use* of a building (sense 1) is closer to the meaning here than the *use* of a tool (sense 3). In any event, if something is done *for the United States' own use*, and no use is made of it or contemplated for 60 years, it's hard to see the creation of the thing as having been for some given use. Again, the Government's argument falters.

*Id*. at 5-6 (emphasis in original).

Professor Schein reported on "those aspects of meaning and grammar in the quoted phrases ["all lands filled in, built up, or otherwise reclaimed by the United States for its own use"] pertinent to determine whether Wisteria Island falls under the grant §1301 (a)(3) [to the United States] or under the exception (§1313(a)). Doc 38-45, p. 1. Professor Schein addressed "Causative verbs [and] Causative agency. He continued:

21

In omitting mention of cause, agent, or purpose, the language of the grant (§1301(a)(3)) "all filled in, made or reclaimed lands…" describes any land that is the result of the events mentioned, without further qualification, and thus describes Wisteria Island. In contrast, the language of the exception (§1313(a)) "all lands filled in, built up, or otherwise reclaimed by the United States for its own use," names both agent (the United States) and purpose (its own use), "by the United States for its own use."

\*\*\*

It remains that the United States dredged Key West Harbor for its own use in navigation (10), that the dredging project created Wisteria Island of landfill dredged from the harbor (11), and that the United States filled in (or, built up) Wisteria Island (12) (or (15)).  But, it cannot be inferred that the United States filled in (or, built up) Wisteria Island for its own use (7) … Whether the United States filled in or built up Wisteria Island for its own use is a conclusion reached only in the presence of further evidence about intentions missing from the record. . . . In any case, it remains a matter of discovery to ascertain latent purpose for the island when none can be correctly inferred from the purpose of the project that created it.

It is then not to be concluded that Wisteria Island falls under the language of the exception (§1313(a)) as land "filled in, built up, or otherwise reclaimed by the United States for its own use."

\*\*\*

The question is two-fold:  whether the purpose of an action must be later than the action, and whether it may be that to create something is to use it.

\*\*\*

*But, a purpose described by the object of the preposition* for *describes future and perhaps multiple events*. (Emphasis supplied).

\*\*\*

In sum, if as in (16), the United States did fill in, build up, or create Wisteria Island for its own use, it never used it. There are two strikes against concluding otherwise:  i. the

> filling in, building up, or creation of Wisteria Island is not
> in the future that the *for*-phrase "for its own use" requires;
> and, ii. Creation is not use, as a matter of the lexical
> meanings of *fill, build, create, and use*.

*Id*. at 1-3.

The Government moved to strike the Garner and Schein expert opinions arguing that "'questions of statutory interpretation are pure questions of law'" (Doc 37, p.4) (internal citation omitted), and the trial court agreed: "Linguists, legal lexicographers, and grammarians are not relevant experts in a property ownership dispute." Doc 67, pp 7-8. But that misses the mark; this is not simply a "property dispute," it is a case of statutory interpretation, an area in which courts must, and do, look for help. And as a matter of the Federal Rules of Evidence, even if Garner or Schein touched on an ultimate issue, Rule 704(a) permitted their opinions.

> Rule 704. Opinion on an Ultimate Issue
> (a) In General – Not Automatically Objectionable. An
> opinion is not objectionable just because it embraces an
> ultimate issue.

The Advisory Committee Notes explain: "The older cases often contained strictures against allowing witnesses to express opinions upon ultimate issues, as a particular aspect of the rule against opinions. The rule was unduly restrictive, difficult of application, and generally served only to deprive the trier of fact of useful information. . . . The basis usually assigned for the rule, to prevent the witness from 'usurping the province of the jury,' is aptly characterized as 'empty rhetoric.'" Fed.

23

R. Evid. 704 advisory committee's note. The linguistic experts (and Finkbeiner's opinions (Doc 38-12))[12] were helpful and admissible as to the meaning and application of the statutes in play. Finkbeiner's factual opinions served to provide the trial court with the factual window for applying the statutory scheme; Messrs. Garner and Schein provided the linguistic insights to be used in the process of applying the statutory scheme. It was error to strike them.

The Supreme Court has recognized that linguistics may be utilized in interpreting legal documents. In *District of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783 (2008), Justice Scalia, addressing the Second Amendment, wrote:

> The Second Amendment is naturally divided into two parts: its prefatory clause and its operative clause. The former does not limit the latter grammatically, but rather announces a purpose. The Amendment could be rephrased, 'Because a well regulated Militia is necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed.' See J. Tiffany, a Treatise on Government and Constitutional Law, § 585, p. 394 (1867); *Brief for Professors of Linguistics and English as Amici Curiae 3 (hereafter Linguistics Brief)*.

*Id*. at 577 (emphasis supplied). Justice Scalia's majority opinion in *Heller* is replete with reliance on treatises, commentaries and dictionaries addressing that "[t]he two sides in this case have set out very different interpretations of the Amendment." *Id*.

---

[12]    See discussion, *infra* at 29-31, relating to the Finkbeiner Report. Finkbeiner is a surveyor/historian who the Government sought to partially exclude in relation to about 20 pages of his report. Doc 37, p.7.

24

His assay of those sources led to him to write: "These provisions demonstrate –

again, in the most analogous linguistic context – that 'bear arms' was not limited to

the carrying of arms in a militia." *Id*. at 585-586.

Justice Scalia used the Amicus Brief of Professors of Linguistics to buttress

his decision:

> Every example given by petitioners' amici for the
> idiomatic meaning of "bear arms" from the founding
> period either includes the preposition "against" or is not
> clearly idiomatic. See Linguistics' Brief 18-23.

*Id*. at 586. The "Linguistics Brief" appears both in the majority opinion and Justice

Stevens' dissent: "Brief for Professors of Linguistics and English as Amicus Curiae

19." 554 U.S. at 636 (Stevens, J. dissenting). *See also*, 580 U.S. at 648, footnote 9:

Amici Professors of Linguistics and English reviewed uses of the term "bear arms. .

. ."[13]

We agree that a court is the final arbiter of questions of law. The error made

by the court below was its failure to recognize the difference between deciding the

question of law and expert assistance in understanding language and sentence

---

[13] The role of linguistics in judicial decision making is recognized and examined in, Thomas R. Lee and Stephen C. Mouritsen, JUDGING ORDINARY MEANING, 127 Yale L.J. 788 (2018). BYU Law has sponsored four conferences on Law and Corpus Linguistics. The latest in February 2019. See https://www.prnewswire.com/news-releases/byu-law-hosts-4th-annual-law-and-corpus-linguistics-conference-launches-version-3-0-of-leading-edge-technology-platform-300808449.html

structure to decide questions of law. Just as there are "rules of law," there are "rules of language." To exclude specialized expertise on language is inconsistent with the goal of Federal Rule of Evidence 702. The Rule provides, in relevant part, that: "a witness with particular 'knowledge, skill, experience, training or education' may offer opinion testimony if, *inter alia*, he is qualified to do so based on his 'scientific technical, or other specialized knowledge.'" *Commodores Entertainment Corp. v. McClary*, 879 F.3d 1114, 1128 (11th Cir. 2008).  Messrs. Garner and Schein met those standards. It was error to exclude their opinions because their opinions met the applicable rules for admission of expert testimony.

Bryan Garner addressed the legal significance of the language and the grammatical construct of "for its own use" in light of its word placement.  The Garner Opinion stated: "As a textual matter, the question is whether for its own use means that the land must have been created for the purpose of using it, or whether its incidental creation is enough use to satisfy the exception." Doc 38-44, p. 3. To answer the question, sentence structure and grammatical rules must be considered.

Garner addressed the meaning of the pertinent phrase and the effect of the "adverbial modifiers: by its own use (an adverbial phrase expressing agency) and for its own use (an adverbial phrase expressing manner or purpose)." *Id*. Those language uses are integral to the inquiry. His linguistic expertise is squarely within Federal Evidence Rule 702: "(a) the expert's scientific, technical, or other

specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."

Garner's expert linguistic opinion would have assisted the court in answering the ultimate question of whether: "filling in and building up are one event (creation) and using is a different event." *Id*. at 3.

Dr. Schein's Expert Report was of a similar genre. Doc 38-45. He wrote: "I report on those aspects of meaning and grammar in the quoted phrases pertinent to determine whether Wisteria Island falls under the grant of §1301 (a)(3) [to the United States] or under the exception (§1313(a))." *Id*. at p. 1. He then provided examples of how to view "causative verbs," "causation v. agency" and "creation as use." *Id*. at 1-3. He wrote: "The temporal relation between action and purpose depends on grammatical form." *Id*. at 3.

One cannot deny that grammatical rules, discussed by experts learned in their construct and application, are helpful to courts' decisions on how statutes are to be read. The Supreme Court recognition of the assistance of linguistic experts underscores the error below in striking Garner and Schein. In *Heller*, the Supreme Court cited with approval the same kind of expert assistance that is being offered here. We set forth below a portion of the Summary of the Argument in the Linguistics Professors' Supreme Court Amicus Curiae Brief in *Heller* to demonstrate the nature of the opinions the Linguistic Professors offered to the Court:

27

> 1. The Second Amendment reads: "A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  Under longstanding linguistic principles that were well understood and recognized at the time the Second Amendment was adopted, the "well regulated Militia" clause necessarily adds meaning to the "keep and bear Arms" clause by furnishing the reason for the latter's existence. The first clause is what linguistics call an "absolute construction" or "absolute clause." It functions by melding the sentence.

Brief for Professors of Linguistics and English, *District of Columbia v. Heller*, No. 07-290 (2008) pp. 3-4.

The Professors expanded on the linguistic issue: "The second comma, however, marks the customary separation of an adverbial clause. . . . it functions to modify the main clause the way an adverbial clause does." *Id*. at 5-6. The Linguistics Professors' Brief is 29 pages long. It is an instructive read on linguistics, the uses of words, of punctuation, and the importance of understanding those principles in deciding even a short sentence, i.e., the Second Amendment. It leaves no doubt that language, even the few words of the Second Amendment, can benefit from expert review. So too can the Submerged Lands Act.

The court below erred in excluding the Garner and Schein opinions. We acknowledge that the court sought to devalue their opinion while dismissing their relevance (Doc 67 p.8), but that failure to credit linguistic, grammar and syntax clouded the court's conclusion. Its holding that: "Creation is not the use. Dredging

is the use" (*id.* at 9) fails to fully consider the proffered expertise. Garner and Schein would have assisted the court below, and their insights into language – that "for its own use" calls for something more than creation, else the exception language would have just been "filled in, built up" by the United States.

The Government complained (Doc 37) that Finkbeiner, in a few pages of his 108-page report (Doc 38-12) was interpreting the SLA. Contrary to the Government's suggestion, his opinions applied his factual findings to the statutory language. That is no different than medical experts testifying about standards of care, leaving it to the finder of fact and law to determine an ultimate question of liability.

The Government complained of pages 28-29, but in those pages Finkbeiner made no effort to interpret the SLA, instead he explained that the facts he found were consistent with legislative history. So too, at pages 82-83, Finkbeiner opined based on his physical observations of Wisteria, when created, in light of his review of historical documents and photographs.

At pages 84-88, Finkbeiner's observations, his testing, and the Navy's own post-dredge survey led to his opinion that 14 acres of seabed was untouched when Wisteria was created in 1942-1943 and cannot meet the "filled-in" exception because they remain unfilled. At pages 88-95, Finkbeiner addressed the legislative history in light of its focus on "installations," "improvements," and "Naval Operations" at existing filled parcels of land occupied and used by the Government,

29

extending from the high water mark into the marginal sea. Based on this, Finkbeiner pointed out that at Wisteria, there are no naval installations, improvements or operations present, or that were intended, when Wisteria was created.

At page 103, Finkbeiner offered no opinion. He was referring to documents from official Florida Trustees Internal Improvement Trust Fund files establishing that Wisteria was not designated as a spoil area for the Navy's 1960's dredging. A surveyor's assessment of facts and a surveyor's, uncontradicted assessment of those facts, was admissible. Compare *Consolidated Rail Corporation v. Grand Trunk Western Railroad Company*, 2011 WL 6004572 *5 (S.D. Mich. 2011); *Newfound Management Corporation v. Sewer*, 34 F.Supp.2d 305,345-347 (D. VI. 1999).

As an expert surveyor and expert in the manner in which properties evolve, his opinions that land under the water line is not a "created" property, as the "filled in" and "built up" statutory language describes, was within his expertise, and helpful to the court. His opinion that an island – the subject property – did not exist until 1943 was uncontradicted and thus whether the subject property could have been "used" before it was formed was an opinion based on what he saw, read and reconstructed from historical records.

As with the Garner and Schein Expert Reports, Finkbeiner's opinions in the few pages identified by the Government, related to the application of facts to language. A court makes the ultimate determination of how to apply the statute to

30

the facts, but there should be no question that Finkbeiner's Report would have assisted the court. The striking of F.E.B.'s experts' opinions deprived the court of critical tools with regard to the proper reading of §1313(a) – "for its own use," and was contrary to the Federal Rules of Evidence.

### III
### DREDGING IS NOT A USE;
### A DREDGE SPOIL IS NOT AN IMPROVEMENT OR AN ACCRETION.
### THE LEGISLATIVE HISTORY SUPPORTS F.E.B.'S "FOR ITS OWN USE" STATUTORY INTERPRETATION

The district court's final words were this tautology: "Creation was not the use. Dredging was the use." Doc. 67, p. 9.

#### A.    The Statute's Plain Language

Dredging is not a "use." It is the act which creates the spoil. This Court recognized that the "island . . . was formed as a result of dredging operations. . . . [that] they deposited the dredge material on a nearby plot of submerged land." *F.E.B. I*, 818 F.3d at 684. "Dredge spoil" means "material taken from the bed or banks of waters by using dredging equipment or other equipment designed for use in extraction of earthen material;" "waste materials arising from dredging operations from the sea, an estuary or an inland waterway."[14]

Dredging relates to the "filled in" language of §1313(a) not the "for its own use" language. Overlooked was that lands created by dredging and filling were

_____

[14]  Available at https://www.lawinsider.com/dictionary/dredge-spoil

among the types of lands granted to the States under §1311. Section 1311 expressly grants to the States all "lands beneath navigable waters," defined in §1301(a)(3) to include "all filled in, made, or reclaimed lands which formerly were lands beneath navigable waters, as hereinabove defined."

The difference between the §1311 grant and the §1313(a) exception is the addition of "for its own use." Because §§1311 and 1313(a) involve the same subject matter in the same statute they must be viewed together. See *United States v. Morton*, 467 U.S. 822, 828, 104 S.Ct. 2769 (1984) ("we do not . . . construe statutory phrases in isolation"); see also, *Black Warrior Riverkeeper, Inc. v. Black Warrior Minerals, Inc.*, 743 F.3d 1297 (11th Cir. 2013):

> As Sir Edward Coke explained, "If any section [of a law] be intricate, obscure, or doubtful, the proper mode of discovering its true meaning is by comparing it with the other sections, and finding out the sense of one clause by the words or obvious intent of the other." Antonin Scalia & Bryan A. Garner, Reading Law: *The Interpretation of Legal Texts* 167 (2012) (alteration in original) (quoting 1 Edward Coke, *The First Part of the Institutes of the Laws of England, or a Commentary Upon Littleton* § 728, at 381a (14th ed. 1791) (1628)).
>
> A related principle of statutory interpretation is that a court should also avoid interpreting a provision in a way that would render other provisions of the statute superfluous.

*Id*. at 1302-1303.

Reading the two sections *in pari materia*, it is apparent that because dredged and filled lands are granted to States under the SLA, dredging cannot be a use within

the exception. If dredging meant "for its own use," the §1311 grant of dredged and filled lands to the State would have no meaning. All filled lands created by Government dredging would be owned by the United States. That result was rejected in the 1946 Solicitor's Opinion, approved and joined in by Attorney General Robert Kennedy's Opinion, "Interpretation of the Submerged Lands Act." Doc 84-1. The Opinion made it clear that the language in the grant to the States protected real estate and other developments that had been made on filled land.

Wisteria was a dump site. It was, and is not, an "improvement;" it is not, and it was not, an "accretion."

## B.    **The Legislative History**

The record contains excerpts from three Congressional hearings during 1953 where the testimony of the Secretary of the Navy and other officials left no doubt that dredging was not a "use" under the exception. Doc 1-31, 1-32, 1-33.

The Navy proposed the §1313(a) "filled in" exception, explaining what "for its own use" were intended to mean. It was not dredging. It was to protect military shore installations constructed and located on filled lands seaward of the high water mark where the installations were located. Doc 1-30, pp. 2-4.

The trial court's interpretation of the statute is at odds with the intention of the drafters. Even if one credits the trial court's literal interpretation of "for its own

33

use," "the intention of the drafters rather than the strict language" controls. *United States v. Ron Pair Enterprises, Inc*., 489 U.S. 235, 242, 109 S.Ct. 1026 (1989).

Robert B. Anderson, the Secretary of the Navy, and Admiral Ira Nunn, the Chief Judge Advocate General of the Navy, explained the rationales behind the exception. Secretary Anderson explained the need and purpose of the "filled in" exception:

> A substantial number of *military and naval installations are located on filled in lands* and have been improved by *the erection of permanent buildings and other structures* at a cost to the Government of many millions of dollars. . . . These lands with *their structures* are truly property which has been developed by the Federal Government.

Doc 1-30, p. 4 (emphasis supplied).

Anderson stated the purpose of the requested exception was to protect "title to *military shore installations*." *Id*. (Emphasis supplied). He continued:

> …the whole point that we are suggesting is that if there is not adequate clarifying language in any of the bills to provide *for a title to land where military installations have been made,* that they should be properly provided for.

Doc 1-30, p. 16 (emphasis supplied).

That the "filled in" exception was to protect military shore installations existing in 1953 built on filled lands and on which buildings, structures, and physical improvements had been made is clear. Wisteria could never have been within this description. Wisteria was never part of military shore installation, nor were there any

34

military shore installations, naval activities, buildings, structures, or improvements on the dredge spoils.

Admiral Nunn provided two lists of installations sought to be protected where there was "filled in land." One was a "[l]ist of *improvements* made by the Navy at naval activities in which the improvements have been added beyond mean low water and into the marginal sea." Doc 1-30, p. 8. The full wording relating to the Key West Naval base was:

> Fill, bulkheads, piers, structures have been constructed *beyond low-water line*

*Id*. at 8 (emphasis supplied). Nothing exists on Wisteria beyond the line of mean low water into the marginal sea.  Doc 38-12, pp. 86-94.

The second list was entitled a "Partial List of Naval Activities in Tidal Water Areas Where Title of Record Has Not Been Acquired for Any *Improvements* Beyond the High Water Line." Doc 1-31, p. 22 (emphasis supplied). Nunn further explained:

> The Department of the Navy has substantial portions of land *which have been occupied for naval purposes and have been improved by the erection of permanent buildings, quay walls, piers, and other structures, including filling in, at a cost to the Government of millions of dollars.* In some instances the improvements were constructed on lands lying within inland waters, obviously the property of States, and in others the improvements extend beyond the low-water mark into the marginal sea. In many instances these lands have been occupied and improved by the United States without perfecting a title of record in the United States.

*Id*. at 19-20.

***

| | |
|---|---|
| Nunn: | Sir, they should have been so handled [obtained by deed from the State]. I fear however, that due to negligence or laches or something that there are occasions when we filled land or built piers or seawalls along the coastline between high-water mark and low-water mark, which was State property, and that in some cases we did not take means to protect our title. |
| Mr. Wilson: | I would say as far as I am personally concerned, I would certainly favor a provision clarifying the Federal Government's ownership of those installations, whatever they might be, *if they are in active use.* |
| Nunn. | Yes Sir. |

*Id*. at 21-22.

What the legislative history makes clear was that the Navy and the legislators agreed that the "filled in" exception was to cover: 1) military shore installations improved with buildings or other structures; 2) built only on fill located in the littoral zone from the mark of high water into the marginal sea; and 3) that were in active use in March of 1953. None of those exception requirements described or could ever apply to Wisteria. The exception was not intended to cover abandoned dredge spoils. As the December 14, 1956 Report from the Commander of the Key West Naval Base said, he could find no intended use for Wisteria and that it was only created

36

"incidental" to dredging: "there was no indication that a specific use of the Island was contemplated." Doc 38-23.

At the 1953 hearings, the Attorney General, Herbert Brownell, Jr., described the purpose of the exception and recommended that the statute be drawn "to guard Federal installations already made." Doc 1-32, p. 4. That purpose generated the §1313(a) exception. It was drafted to protect federal installations already made, and nothing else.

Florida Senator Spessard Holland sought assurances that the Government would never try to expand the purpose of the exception in an effort to take private property. He had an extended discussion and obtained clear assurances from Brownell on the meaning and application of the "filled in" exception:

> Senator Holland:    You not only support the section which I have just read from S. 107, but you go further and cover the entire period of time *from now on out into the future,* to release the development and use of such structures *and the bottoms* within historic boundaries of the States for such development and use?
>
> Brownell:    Yes.
>
> Senator Holland:    To release it of any Federal claims of any sort whatsoever in the field of property use?
>
> Brownell:    In the field of property use.

Doc 1-32, p. 33.

This case is exactly what Congress did not want, an exception construed to allow a Government agency to take private property. Senator Daniels said it best:

> We feel that this legislation is necessary in order to try to make it clear by an act of Congress that in the future these property rights are to be kept separate from the political rights of the national sovereign and that the only way the national sovereign *can get property from any State or from any individual is by due process of law.* You understand the reason we have that in this bill?
> ***
> We want to…write the law for the future in this country that the national sovereign can never take property from a State or an individual on any so-called theory of political powers being so much paramount that the property rights automatically coalesce with the political powers.

*Id*. at p. 22.

The district court's ruling is at odds and inconsistent with the legislative purpose and intent of the §1313(a) "filled in" exception. The decision below should be reversed.

## IV
## THE NAVY UNDERSTOOD THE DREDGE SPOIL ISLAND WAS NOT CREATED "FOR ITS OWN USE"

Even before the 1940's dredging started, the Navy knew that they would not be filling in Wisteria "for its own use." Prior to dredging, the Navy received an opinion from the Department of the Interior advising it that spoil islands created by

the 1940's dredging would be sovereign lands of the State of Florida and not United States Government property. Doc 38-6.[15]

Recognizing this, the Navy asked the TIIF for permission to deposit dredge spoils on submerged lands owned by the State. Doc 38-2, pp. 2-3. The Navy did have uses for some of the spoil areas it was going to create. An arrangement was made that the TIIF would deed to the Navy, at no cost, any spoil areas created by the 1940's dredging upon the Navy sending a metes and bounds description of what they wanted. Doc 38-3, pp. 1-2. In 1946 the Navy sent a deed for what they wanted and had plans to use. Doc 38-8. It did not include the Wisteria spoil island, nor three other spoil islands created by the 1940's dredging – islands that the Navy believed belonged to the State of Florida as sovereign State lands. *Id*. The decision to not seek Wisteria was a deliberate and intentional decision, not a product of negligence or laches, and reflected a clear recognition that Wisteria was private property.

The Navy could not have intended Wisteria to be "for its own use" in the 1940's when it created it. It would not have had title or any right to use it except as a place to deposit dredge spoil, with TIIF's permission. That is not an "own" use.

After passage of the SLA, the Navy considered using Wisteria as an offshore fuel depot and needed to know if Wisteria was reserved to the Navy under §1313(a).

---

[15]    The fact that submerged lands off the coast of Florida belong to the State of Florida had been long settled by federal courts. See, *Pope v. Blandon*, 10 F.Supp. 18 (N.D. Fla. 1935).

Admiral Jelley, in June 1953, sought an opinion from the Bureau of Land Management as to whether Wisteria was the property of the Navy under the §1313(a) exception. Doc 38-17.

On November 20, 1953, shortly after the May 1953 enactment of the Submerged Lands Act, Bureau of Land Management Director Woogsley, responding to an inquiry from the Navy, stated that the Bureau could find no basis for Government ownership of several islands, including Wisteria, and made clear that merely creating an island was not sufficient to satisfy the exceptions:

> It is not stated whether the islands were created by the United States intentionally for its own use nor whether those islands are presently and actually occupied by the United States which is necessary to bring them under Section 5 of the act.

Doc 38-4, p. 2. [16]

Woogsley concluded that the four islands, including Wisteria, were in Florida's submerged lands and "recourse must be had to the normal judicial procedure to establish the right or title to the areas in question." *Id*.

As a result of Director Woogsley's opinions, on February 26, 1954, the Navy's Chief of the Bureau of Yards and Docks (BUDOCKS) wrote to the District Public Works Officer for the Key West area requesting research to determine if the

---

[16] It is important to note that the Navy, in response to a Request for Admissions, answered that it is not "aware of any chart or map that marks 'Wisteria Lands' as Naval Reserve or 'Nas [Naval Air Station] Res.'" Doc 38-11, p. 7, ¶ 45.

Navy had placed anything on Wisteria and "anything of record which will indicate an intention on the part of the Government to form the islands for its own use." Doc 38-20, p. 1.

Over the next two years, the Navy conducted a search of its records to determine whether the Navy had any intention or plan to use Wisteria when it created it. The Navy acknowledged that just using seabed as a place to deposit and discard spoil was not a "use" under the "filled in" exception. On August 31, 1956, the Assistant Chief of Real Estate of the Navy, F. M. Mosely, wrote to the Chief of BUDOCKS and explained that, if the Navy wanted Wisteria, it should start condemnation proceedings because it would appear that…the Navy would have a difficult time in proving that this island was built up for Federal use, inasmuch as the records indicate that the only reason for the establishment of the island in 1943 was a site for the deposit of spoil. It appears, therefore, that it will be necessary to acquire this island by condemnation proceedings." Doc 38-21, p. 2.

The issue of title to, and use of, Wisteria Island reached the highest-ranking flag officer in the Navy, the Chief of Naval Operations (CNO). On September 26, 1956, the CNO stated that there was a need to relocate fuel storage to Wisteria and asked:

> . . . Chief, Bureau of Yards and Docks [BUDOCKS]
> continue to research as to the legal status of ownership of
> the island and to determine the necessary steps for
> acquisition by the Navy.

41

Doc 38-22. The status was highly important to the highest Naval officials.

On December 31, 1956, BUDOCKS completed its research into whether there was any evidence that Wisteria was created by the Government for its own use within the meaning of the SLA exception. Doc 38-23, p. 1. The District Public Works Officer answered the use inquiry, attaching a December 14, 1956 report from the Commander of the Key West Naval Base explaining that he could find no evidence that Wisteria was built by the Government for its own use:

> 2.      The subject land was deposited as spoil *incidental to* the deepening of the ship channel. There is *nothing on record* locally to indicate whether or not it was the intention of the Navy to use the island after it was created.

> 3.      Before the submission of Shore Station Development Board Project No. 6ND 467 in November 1952, there was no indication that a specific use for the Island was contemplated.

Doc 38-23, p. 2 (emphasis supplied).

After December 31, 1956, the Navy eschewed any claim that Wisteria was Government owned by virtue of the "filled in" exception. On September 5, 1957, the Navy ordered and obtained two appraisals on Wisteria to support a condemnation value. Doc 38-24.

After obtaining the two appraisals the Navy published an Advance Planning Report for Fiscal Year 1959 discussing the relocation of fuel storage to Wisteria Island "For the Acquisition of Real Property." Doc 38-25. In that report the "Type

of Ownership" of the 39.03 acres constituting the Wisteria location is stated to be "Private." *Id*. at 3. The estimated cost of acquisition of the land, based on appraisals and the upward trend in real estate values, was $56,665. *Id*. at 3-4.

By 1960, the Navy saw a less expensive and better option to relocate fuel storage: the other spoil islands, created in the same manner as Wisteria, by the 1940's dredging. The acquisition of those islands and the 55 surrounding acres of submerged lands would cost only $10,000. Doc 38-9. That site became known as the site for "Tank Island." *Id*.

In 1961, the United States sued the State of Florida in the District Court of the Southern District of Florida to obtain the two islands and the 55-acre Tank Island site by the power of eminent domain in case number 10,985 – M-civil (S.D. Fla.). Doc 38-29. The Government represented to United States District Court Judge David Dyer, of the Southern District of Florida:

> 1)    That the 55 acres was owned by the TIIF.
>
> ***
>
> 3)    Attached a certificate of inspection and possession in which the Navy certified to Judge Dyer that the 55 acres had been "acquired by the United States of America in connection with Civil Action #10895, project from Trustees of the Internal Improvement Fund of Florida.
>
> 4)    Attached a "Notice of Taking." The Notice of Taking attached Official Naval Drawing P-3316 that showed Wisteria as "Privately Owned."
>
> 5)    That $10,000 was the value of the 55 acres and was paid to the State of Florida and on the Stipulation for the

43

entry for a Final Judgment of Taking, the United States
represents to Judge Dyer that the TIIF owned the 55 acres.

*Id*. pp. 1-2.

That Wisteria was privately owned was established by the Official Naval
Drawing P-3316. Doc 38-27. That drawing was incorporated into the Final
Judgment of Taking. The Final Judgment on Taking was entered by Judge Dyer on
December 27, 1961. Doc 38-30. On May 23, 1962, Attorney General Robert F.
Kennedy examined the records and the Final Judgment by which the United States
acquired title to the 55 acres from the TIIF and found that this acquisition was regular
and vested title in the United States. Doc 38-31. Therefore, by 1962, the United
States had taken title to all the islands that in 1953 Bureau of Land Management
Director Woogsley had identified as owned by the State of Florida under the SLA,
save Wisteria Island.

The Government did not seek to take Wisteria because of the expense, but the
fact that it considered such a taking, that it recognized it was privately owned, that
it recognized there was no use to be had of the dredge spoil, confirms that there was
no improvement, accretion, or embracement of the island that brought it within the
"for its own use" meaning. The Government Responses to Requests for Admissions
seal the deal:

44

> [The] United States admit[s] that from 1940 through the date of these Requests for Admissions the United States has not constructed any physical buildings or structures on the Subject Property. (Admission Resp. ¶ 72).
>
> ***
>
> While the United States admits that it is not currently aware of any chart or map that marks "Wisteria Lands as Naval Reserve" or "Nav Res," the Subject Property is marked as "HB Spoil Bank Wisteria Island" on a 1974 Navy Air Station map depicting Navy properties. (Admission Resp. ¶ 45).

Doc 38-11.  Wisteria is, as the Government admits, only a "spoil bank."  That does not bring it within the SLA exception.

The undisputed fact that the dredge spoil formation of the island was not used, not even planned to be used, believed and acted upon as being private property, is consistent with the plain language as understood by the Navy officials: the Submerged Lands Act exception did not apply to Wisteria.

### V
### THE SUBJECT PROPERTY IS NOT ALL DREDGE SPOILS. <u>SUMMARY JUDGMENT AS TO ALL 39 ACRES WAS ERROR</u>

It is undisputed that the 39 acres contained in the Wisteria legal description that the district court quieted title to, were not "filled in" or "built up." Expert Surveyor Finkbeiner studied historical maps and charts, the Army Corp's post-dredge survey on the 30 acres, and dove and personally examined the submerged land surrounding the Wisteria Island upland, and opined in his Expert Report:

> The 14 original acres of submerged land existing when the island was created and delineated above, would all be natural, non-filled seabed. An additional four acres, for a total of 18 acres, are currently seabed as most spoil appears to have been washed off in these areas.

Doc 38-12 p. 87.

Thus, the only competent testimony in this case established that the submerged lands surrounding the Wisteria upland could never fall within the ambit of the §1313(a) exception.

In its Answer, F.E.B. specifically denied that all 39 acres were subject to the SLA and identified the surrounding unfilled, submerged lands as passing to the State, and then to F.E.B., and never possibly reserved to the United States. Doc 15.

The Government's Motion for Summary Judgment described the property this way:

> [A]pproximately 39 (thirty-nine) acres of land off the coast of Key West, Florida, with over 20 (twenty) acres above the water line. F.E.B. Corp.'s Answer, Affirmative Defenses and Counterclaim (Answer) ¶2 [D.E. 15]. In this case, it is undisputed that the land above the water line was created by the United States during a dredging project in Key West Harbor in the 1940s; that the dredging project was conducted by the United States in order to increase the Key West Harbor channel and turning basin for the Navy's use; and that the Subject Property was used as a spoil location during the 1940s dredging project.

Doc 35 at pps. 1-2. The Government could not contest that 18 acres were not filled land.

46

After the district court granted summary judgment in favor of the Government, F.E.B. filed a "Notice of Objection to Proposed Final Judgment and Motion for Hearing on Entry of Final Judgment," setting forth that "[t]he problem is that the Government's proposed final judgment quiets title in its favor to approximately 39 (thirty-nine) acres of artificially created upland. . . . However, only the '20 acres above sea level' can be characterized as the 'filled in . . . for its own use exception of 1313(a).'" Doc 70, p. 1.

The Government objected, saying the objection must be made via Rule 59 or 60 (Doc 74, pp. 1-2) and F.E.B. filed a Motion to Alter and Amend a Rule 60 Motion. Doc 75. That Motion set forth the fact that the "Government did not offer any evidence that the non-island land was filled in or built up by dredge spoils," and that "[b]ecause it cannot be said that 39 acres are within the exception, and because the only undisputed fact is that the non-island land was not filled in or built up by the Navy contractors, the Summary Judgment Order should be amended to reflect that fact or to be viewed as a partial summary judgment." Doc 75, pp. 3-4.

The district court denied the Motion, ruling, *inter alia*, that F.E.B. did not preserve the issue at the summary judgment stage and that the "Subject Property" had been continually referred to and "defined by both parties as a 39-acre parcel of land." Doc 86, pp. 5-6. The Court "alternatively den[ied] the Motion on the merits," stating

47

> Under the SLA 'all lands filled in, built up, or otherwise reclaimed by the United States for its own use' are expressly excepted from the operation of that statute. 43 U.S.C. § 1313(a). Straight forwardly, 'all lands, includes lands that are not only above sea level, but also lands that are submerged. The statute does not contain the distinction that Defendant presses in the Motion.

*Id*. at 6.

However it is clear from the legislative history that the distinction exists: submerged lands are lands that belong to the state. See, pp. 33-38, *supra*, discussing the commitment to the state's rights to their submerged land.  The district court's alternative explanation for denying Rule 59/60 relief, and its "waiver" ground result in a judgment that patently is belied by undisputed facts, were error.

A finding is "clearly erroneous" where a reviewing body "is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395. 68 S.Ct. 525 (1948).

Here, it was clearly erroneous to grant summary judgment quieting title to submerged lands that were not within the §1313(a) exception to the SLA.

## CONCLUSION

For over 60 years the Government has disdained responsibility for, interest in, use of Wisteria Island. F.E.B., Corp. has for years paid property taxes to Monroe County, taken responsibility for the property, sought to protect it from misuse, sought to insure County responsibility for safekeeping of those who seek its refuge.

48

Language, legislative history and the understanding of those who were present at the creation recognized that the property was not within the "for its own use" exception. This Court should come to the same conclusion. The judgment below should be reversed with directions to grant summary judgment and quiet title in favor of F.E.B. Corp.

Respectfully submitted,

/s/ Bruce S. Rogow

TARA A. CAMPION                    BRUCE S. ROGOW
FL. Bar No.: 90944                 FL. Bar No.: 067999
**BRUCE S. ROGOW, P.A.**            **BRUCE S. ROGOW, P.A.**
1199 S. Federal Hwy., #212         P.O. Box 749
Boca Raton, FL 33432               Cedar Mountain, NC 28718
PH: 954.767.8909                   PH: 954.767.8909
tcampion@rogowlaw.com              brogow@rogowlaw.com

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that this Initial Brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B)(i) and contains 12,918 words.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 25, 2021, I electronically filed the foregoing Corrected Initial Brief with the Clerk of Court using CM/ECF. I also certify that the foregoing is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ Bruce S. Rogow