No. 20-14047

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

F.E.B. CORP., a Florida Corporation,
*Defendant/Appellant*,

v.

UNITED STATES OF AMERICA,
*Plaintiff/Appellee.*

Appeal from the United States District Court for
the Southern District of Florida
No. 18-cv-10203 (Hon. Jose E. Martinez)

**BRIEF FOR APPELLEES**

TODD KIM
*Assistant Attorney General*

MICHAEL T. GRAY
*Attorney*
Environment and Natural Resources Division
U.S. Department of Justice
701 San Marco Blvd.
Jacksonville, FL 32207
(202) 532-3147
michael.gray2@usdoj.gov

F.E.B. Corp. v. United States, No. 20-14047

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-2(b), undersigned counsel hereby certifies that the following is a complete list of all persons and entities known to have an interest in the outcome of this appeal:

Bruce S. Rogow, P.A.

Campion, Tara A.

Erickson-Pogorzelski, Anthony

F.E.B. Corp. – Appellant

Gray, Michael

Kim, Todd

Martinez, Hon. Jose E.

Rogow, Bruce S.

United States of America


/s/ *Michael T. Gray*
MICHAEL T. GRAY

Counsel for Appellees

C1 of 1

## STATEMENT REGARDING ORAL ARGUMENT

The United States believes that oral argument would benefit the Court in this case. This appeal involves important questions on the interpretation of the Submerged Lands Act as it pertains to lands over which the United States claims title as well as the admissibility of expert testimony offering opinions on the purely legal issue of statutory interpretation.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ...................................................................i

STATEMENT REGARDING ORAL ARGUMENT ...............................................i

TABLE OF AUTHORITIES .....................................................................iv

GLOSSARY.............................................................................................iv

INTRODUCTION .....................................................................................1

STATEMENT OF JURISDICTION.............................................................2

STATEMENT OF THE ISSUES.................................................................2

STATEMENT OF THE CASE....................................................................3

     A.    Factual Background.................................................................3

     B.    Course of Proceedings............................................................6

     C.    Standard of Review ...............................................................6

SUMMARY OF ARGUMENT ....................................................................7

ARGUMENT ...........................................................................................9

I.    The district court correctly concluded that the United States
    owns Wisteria Island.............................................................................9

     A.    This Court previously held that the Submerged Lands
        Act does not clearly and unequivocally transfer title of
        Wisteria Island to Florida. .................................................10

     B.    Plain language, Supreme Court case law, and legislative
        history each reinforce the conclusion that when Congress
        passed the Submerged Lands Act, the United States
        retained title to Wisteria Island. .........................................16

II.    The district court did not abuse its discretion by striking
       F.E.B.'s improper expert reports on statutory interpretation. .......................24

III.   The district court correctly denied F.E.B.'s motion under Rules
       59(e) and Rule 60 ............................................................................30

CONCLUSION ........................................................................................32

CERTIFICATE OF COMPLIANCE .........................................................34

# TABLE OF AUTHORITIES*

## Cases

*Aldana v. Del Monte Fresh Produce N.A., Inc.*,
741 F.3d 1349 (11th Cir. 2014) ........................................................7

*Bacchi v. Mass. Mut. Life Ins. Co.*,
No. 12-CV-11280-DJC, 2016 WL 1170958, at *2 (D. Mass.
Mar. 23, 2016) ........................................................................27, 28

*Bartlett v. Mut. Pharm. Co.*,
742 F. Supp. 2d 182 (D.N.H. 2010) ..............................................28

*Caldwell v. United States*,
250 U.S. 14 (1919)............................................................................9

\* *California ex rel. State Lands Comm'n v. United States*,
457 U.S. 273 (1982)................................... 5, 9, 14, 18, 19, 20, 22

*Caro–Galvan v. Curtis Richardson, Inc.*,
993 F.2d 1500 (11th Cir.1993) ......................................................25

*Chackal v. United States*,
No. 07-80723-CIV, 2008 WL 5056509, *4 (S.D. Fla. Nov. 21,
2008) ..............................................................................................16

*Commodores Ent. Corp. v. McClary*,
879 F.3d 1114 (11th Cir. 2018) ....................................7, 25, 26, 27

*Dahlgren v. Muldrow*,
No. 106CV00065MPAK, 2008 WL 186641, at *5 (N.D. Fla.
Jan. 18, 2008)..................................................................25, 26, 28

*Diamondback Indus., Inc. v. Repeat Precision, LLC*,
No. 6:19-CV-00034-ADA, 2019 WL 7761432, at *1 (W.D.
Tex. Aug. 20, 2019) .......................................................................29

---

* Authorities upon which we primarily rely are marked with asterisks.

iv

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)...................................................................29

\* *F.E.B. Corp. v. United States*,
    818 F.3d 681 (11th Cir. 2016) .......... 1, 6, 9, 10, 11, 12, 13, 14, 15, 20, 22, 23

*Frye v. Hamilton Cty. Hosp.*,
    No. 18-CV-3031-CJW-MAR, 2019 WL 2404330, at \*4 (N.D.
    Iowa June 7, 2019)........................................................................27

*Gonzalez v. Sec'y for Dep't of Corr.*,
    366 F.3d 1253 (11th Cir. 2004) ...................................................31

*In re Initial Pub. Offering Sec. Litig.*,
    174 F. Supp. 2d 61 (S.D.N.Y. 2001) ..........................................30

*In re Lynch*,
    755 F. App'x 920 (11th Cir. 2018)..........................................25, 26

*Int'l Aircraft Recovery, LLC v. Unidentified, Wrecked & Abandoned
    Aircraft*,
    218 F.3d 1255 (11th Cir. 2000) ...................................................11

*Jenkins v. Anton*,
    922 F.3d 1257 (11th Cir. 2019) .....................................................7

*Karp v. CIGNA Healthcare, Inc.*,
    882 F. Supp. 2d 199 (D. Mass. 2012).........................................28

*Layton v. DHL Express (USA), Inc.*,
    686 F.3d 1172 (11th Cir. 2012) .....................................................7

*Lind v. International Paper Company*,
    2014 WL 11332304  (W.D. Tex. 2014) ..................................27, 29

*Marbury v. Madison*,
    5 U.S. 137 (1803).........................................................................30

*McCarthan v. Director of Goodwill Industries-Suncoast, Inc.*,
    851 F.3d 1076 (11th Cir. 2017) ...................................................28

*Michael Linet, Inc. v. Vill. of Wellington, Fla.*,
   408 F.3d 757 (11th Cir. 2005) ........................................................31

*Nieves–Villanueva v. Soto–Rivera*,
   133 F.3d 92 (1st Cir.1997)..............................................................25

*Powell v. Thomas*,
   643 F.3d 1300 (11th Cir. 2011) ..............................................12, 13

*Smith v. Haynes & Haynes P.C.*,
   940 F.3d 635 (11th Cir. 2019) ..........................................................6

*Snapp v. Unlimited Concepts, Inc.*,
   208 F.3d 928 (11th Cir. 2000) ........................................................25

*St. John United Church of Christ v. Federal Aviation Administration*,
   550 F.3d 1168 (D.C. Cir. 2008) .....................................................16

*United States v. California*,
   332 U.S. 19 (1947)............................................................................4

*United States v. Frazier*,
   387 F.3d 1244 (11th Cir. 2004) ........................................................7

*United States v. Kaley*,
   579 F.3d 1246 (11th Cir. 2009) ......................................................12

*United States v. Mikutowicz*,
   365 F.3d 65 (1st Cir. 2004)........................................................25, 27

*United States v. Prigmore*,
   243 F.3d 1 (1st Cir.2001)................................................................27

*United States v. Union Pac. R.R. Co.*,
   353 U.S. 112 (1957)....................................................................9, 14

## Statutes and Court Rules

28 U.S.C. § 1345 ...................................................................................2

Declaratory Judgment Act
    28 U.S.C. § 2201 .........................................................................2

Rivers and Harbors Act of 1899
    33 U.S.C. § 403 .........................................................................18

    33 U.S.C. § 408 .........................................................................18

* Submerged Lands Act
    43 U.S.C. § 1301 ....................................................................5, 21

    43 U.S.C. § 1301(a)(3) ..........................................................17, 19

    43 U.S.C. § 1311 .........................................................................5

    43 U.S.C. § 1311(b) ..............................................................10, 11

    43 U.S.C. § 1313(a) ............................... 1, 5, 10, 11, 12, 20, 25, 31

Fed. R. App. P. 4(a)(1)(B) .................................................................2

## Other Authorities

Submerged Lands: Hearings on S.J. Res. 13, S. 294, S. 107, S. 107
    Amend S. Comm. on Interior and Insular Affairs, 83rd Cong.
    544–556 (1953) .......................................................................22

## GLOSSARY

SLA             Submerged Lands Act

QTA             Quiet Title Act

## INTRODUCTION

The United States brought this Declaratory Judgment Act case against F.E.B. Corp. to quiet title in Wisteria Island, a 39-acre island near Key West, Florida, that was created by the United States Navy in the 1940s. This Court previously considered the dispute when F.E.B. Corp. sued under the Quiet Title Act. *F.E.B. Corp. v. United States*, 818 F.3d 681 (11th Cir. 2016). There, this Court held that suit was barred by the Quiet Title Act's statute of limitations because the United States had asserted a claim to title in 1951 and the passage of the Submerged Lands Act in 1953 did not "clearly and unequivocally abandon" the United States' claim. *Id.* at 688. The claim to title was not clearly abandoned because the Submerged Lands Act excepted from conveyance to the states "all lands filled in, built up, or otherwise reclaimed by the United States for its own use," 43 U.S.C. § 1313(a), and Wisteria Island was used "for the government's purpose and benefit of storing fill accumulated from nearby dredging operations." *Id.* Because it lacked jurisdiction, this Court did not rule on the merits of the title dispute.

The merits are now before this Court. Once again, the appeal turns on the interpretation of the Submerged Lands Act's exception for lands filled in or built up by the United States for its own use. Once again, this Court should conclude

that Wisteria Island is covered by the exception. This Court should therefore affirm the district court's judgment quieting title.

## STATEMENT OF JURISDICTION

(A)    The district court had subject matter jurisdiction under 28 U.S.C. § 1345 to adjudicate the United States' claim under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.* R.1:2.[2]

(B)    This Court has jurisdiction under 28 U.S.C. § 1291 because the district court entered a final judgment. R.76.

(C)    That judgment was entered on August 27, 2020. R.76. F.E.B. Corp. timely filed its notice of appeal on October 27, 2020, or 60 days later. R.87; Fed. R. App. P. 4(a)(1)(B).

(D)    The appeal is from final judgment that disposes of all parties' claims.

## STATEMENT OF THE ISSUES

1.    Whether the United States filled in or built up Wisteria Island for its own use when the Navy used the lands to store spoil from nearby dredging operations conducted to benefit the Navy.

---

[2] In this brief we use the form R.[docket number-attachment]:[page] for references to the record, such that the reference R.1-4:2 refers to docket entry 1-4 at page 2.

2.      Whether the district court acted within its discretion when it excluded from evidence the expert opinions of linguists and legal lexicographers on the interpretation of the Submerged Lands Act.

3.      Whether the district court acted within its discretion when it denied F.E.B.'s motion under Rules 59(e) and 60(b) seeking to raise a new argument not preserved at summary judgment.

## STATEMENT OF THE CASE

### A.    Factual Background

In 1819, the United States entered into the Adams-Onis Treaty with Spain. R.1-4. Under the Adams-Onis Treaty, the United States acquired ownership of the submerged lands on which Wisteria Island now exists.[3] R.1-4. Since 1845, the Navy repeatedly requested that those lands be reserved for military use, recognizing their strategic importance. *See*, *e.g.*, R.1-5, 1-6, 1-7, 1-8, 1-9. In 1924, the lands were reserved under Executive Order 4060. R.1-18. At various times before 1953, the Navy used those lands as a protective barrier for naval operations (against both tidal incursions and private development); as a spoil area; and for operational purposes. *See*, *e.g.*, R.1-5, 1-6, 1-9, 1-12, 1-18, 1-19, 1-20.

---

[3] For ease of reference, we use "Wisteria Island" in this brief to mean both the spoil island and the submerged lands on which the spoil was stored, and differentiate them only when necessary for clarity.

In the early 1940s, while the United States was engaged in World War II, the Navy undertook a major dredging project, together with the Army Corps of Engineers, to dredge the Key West Harbor channel and turning basin for naval use. R.15:4. The lands constituting Wisteria Island were used by the United States to store spoils during the 1940s dredging project, which was conducted by and for the benefit of the United States. R.15:4-5; R.1-21; *see also* Case No.12-10072—R.58-23[4] (Key West Harbor, Fla. 30-Foot Channel and Turning Basin to Naval Operations Base, Job No. 4032, Field Progress Report (1942)).

In 1947, the Supreme Court issued its decision in *United States v. California ("California I")*, 332 U.S. 19 (1947), which resolved a long-standing dispute between the United States and coastal states over ownership of submerged lands in the three-mile belt off the coast of the United States. Before that decision, coastal states maintained that they owned the submerged lands in the three-mile belt under the Equal Footing Doctrine. The Supreme Court disagreed, and held that the United States, not the individual states, held "paramount rights and power over" the submerged lands within the three-mile belt, "an incident to which is full dominion over the resources of the soil under that water area." *Id.* at 38-39.

---

[4] The parties incorporated the record from the prior *F.E.B. Corp.* case into this one at R.28. References to that record take the form Case No.12-10072—R.[docket entry-attachment]:[page].

Even before the 1947 *California I* decision, the Navy asserted ownership over Wisteria Island and objected to Florida's attempt to sell it on the grounds that the United States, not Florida, owned the island. R.1-13, 1-14, 1-15, 1-27, 1-28. Nonetheless, in 1952, over the objection of the Navy, Florida issued a quitclaim deed for Wisteria Island to F.E.B.'s predecessor in interest. R.1-29. At the time Florida issued the deed, it did not own Wisteria Island. Case No.12-10072— R.58-20 (Plaintiff's Response to Defendant's First Request for Admissions ¶¶12, 16, 17, 19).

In 1953, in response to the 1947 *California I* decision, and after Florida issued the quitclaim deed for Wisteria Island, Congress passed, and the President signed into law, the Submerged Lands Act. 43 U.S.C. § 1301 et seq. The Submerged Lands Act is "a constitutional exercise of Congress' power to dispose of federal property." *California ex rel. State Lands Comm'n v. United States ("California II")*, 457 U.S. 273, 285 (1982). The Act transfers ownership over the submerged lands in the three-mile belt off the coast of the United States to the respective coastal states. 43 U.S.C. § 1311. The Act, however, contains express exceptions that exclude certain lands from its operation and ensures that the United States retains ownership over those lands. The relevant exception, for purposes of this appeal, excludes "all lands filled in, built up, or otherwise reclaimed by the United States for its own use." 43 U.S.C. § 1313(a).

### B.    Course of Proceedings

In 2012, F.E.B. filed a suit under the Quiet Title Act seeking to quiet title to Wisteria Island. The district court dismissed the suit as barred by the statute of limitations, and this Court affirmed. *F.E.B. Corp. v. United States*, 818 F.3d 681 (11th Cir. 2016).

The title dispute remained, however, and the United States ultimately filed this declaratory judgment action seeking to quiet title. R.1. On cross-motions for summary judgment, the district court concluded that the United States did not relinquish title in the Submerged Lands Act and therefore issued a judgment quieting title in the United States. R.67, R.76. In doing so, the district court excluded from evidence expert reports proffered by F.E.B. because they merely offered legal conclusions. R.67:7-8. After judgment, F.E.B. filed a motion under Rules 59(e) and 60 seeking to raise a new argument that the judgment should cover only 20 of Wisteria Island's acres because the remaining acres were beneath the water line. R.75, R.77. The district court denied the motion, concluding that F.E.B. had abandoned and waived the argument by not presenting it at summary judgment. R.86. F.E.B. now appeals. R.87.

### C.    Standard of Review

This Court reviews de novo the district court's grant of summary judgment. *Smith v. Haynes & Haynes P.C.*, 940 F.3d 635, 642 (11th Cir. 2019). A court

assessing motions for summary judgment must "resolve all ambiguities and draw reasonable factual inferences from the evidence in the non-movant's favor." *Layton v. DHL Express (USA), Inc.*, 686 F.3d 1172, 1175 (11th Cir. 2012).

This Court reviews "for abuse of discretion the district court's decisions regarding the admissibility of expert testimony and the reliability of an expert opinion." *Commodores Ent. Corp. v. McClary*, 879 F.3d 1114, 1128 (11th Cir. 2018) (quoting *United States v. Frazier*, 387 F.3d 1244, 1258 (11th Cir. 2004) (en banc)). Under that standard, the Court "must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard." *Id.*

This Court likewise reviews a district court's decision on a Rule 59(e) or Rule 60(b) motion for abuse of discretion. *Jenkins v. Anton*, 922 F.3d 1257, 1263-64 (11th Cir. 2019); *Aldana v. Del Monte Fresh Produce N.A., Inc.*, 741 F.3d 1349, 1355 (11th Cir. 2014).

## SUMMARY OF ARGUMENT

1.    The district court correctly concluded that Wisteria Island was filled in or built up by the United States for its own use and therefore the United States retains title to the island. It is undisputed that the United States filled in and built up the island by storing spoil from nearby dredging, which it conducted for the Navy's benefit. Under the plain language of the Submerged Lands Act, storing the

spoil was an activity engaged in by the United States for its own use. This Court's opinion in *F.E.B. Corp.*, which previously concluded in a nearly identical context that Wisteria Island was filled in and built up for the United States own use, and the Supreme Court's opinion in *California II*, which noted in dicta that passive accretion can be a "use" under the Submerged Lands Act's exception, persuasively demonstrate that using the lands to store spoil for dredging done to benefit the Navy is filling it in or building it up for the United States' own use. And the legislative history of the Submerged Lands Act reinforces that conclusion, since spoil areas filled in by the Navy are identified in the legislative history as areas covered by the Act's exception.

2.    The district court did not abuse its discretion when it excluded from evidence F.E.B.'s expert reports from linguists and legal lexicographers. Those reports offered opinions on statutory interpretation, and it is well established that matters of statutory interpretation are legal questions that are reserved to the court. Expert testimony on such questions is therefore impermissible and the district court acted well within its discretion by disregarding the expert reports.

3.    The district court also did not abuse its discretion when it denied F.E.B.'s motion for relief under Rules 59(e) and 60, contending that the judgment should not cover all of Wisteria Island, but only the 20 acres above the water line. The district court correctly concluded that F.E.B. sought to raise that argument for

the first time in its post-judgment motion when it could have raised it earlier, and that F.E.B. in fact had previously made representations to the court to indicate that all 39 acres of the island were at issue. The argument was therefore waived.

The district court's judgment should therefore be affirmed.

## ARGUMENT

### I.    The district court correctly concluded that the United States owns Wisteria Island.

Because it is undisputed that the United States owned Wisteria Island when Congress passed the Submerged Lands Act, this case turns on interpreting that Act to determine whether Congress transferred ownership to Florida when it passed the Act. It did not.

The Submerged Lands Act is "a constitutional exercise of Congress' power to dispose of federal property," *California II*, 457 U.S. at 285, and therefore it must be "construed strictly in favor of the United States," *F.E.B. Corp.*, 818 F.3d at 689. The Act, like any other land grant, thus must be "construed favorably to the Government, [such] that nothing passes except what is conveyed in clear language, and that if there are doubts they are resolved for the Government, not against it." *United States v. Union Pac. R.R. Co.*, 353 U.S. 112, 116 (1957) (citing *Caldwell v. United States*, 250 U.S. 14, 20-21 (1919)); *California II*, 457 U.S. at 287 (reading the Submerged Lands Act to "adhere[] to the principle that federal grants are to be construed strictly in favor of the United States").

9

The Submerged Lands Act provides that "title to and ownership of the lands beneath navigable waters within the boundaries of the respective States . . . [is] recognized, confirmed, established, and vested in and assigned to the respective States," 43 U.S.C. § 1311(a), and that "[t]he United States releases and relinquishes unto said States . . . , *except as otherwise reserved herein*, all right, title, and interest of the United States . . . to all said lands," *id.* § 1311(b) (emphasis added). The statutory exception at play here provides that "excepted from the operation of section 1311" are "all lands filled in, built up, or otherwise reclaimed by the United States for its own use." 43 U.S.C. § 1313(a). By operation of that exception, the United States retained ownership of Wisteria Island, which is land that it filled in or built up for its own use.

### A.    This Court previously held that the Submerged Lands Act does not clearly and unequivocally transfer title of Wisteria Island to Florida.

This is not the first time this Court has been asked to interpret the Submerged Lands Act as it pertains to Wisteria Island, and this Court's previous opinion demonstrates that the United States did not relinquish title to Wisteria Island when it passed the Submerged Lands Act. In *F.E.B. Corp.*, F.E.B. filed an affirmative suit under the Quiet Title Act, which the district court dismissed because the Quiet Title Act's statute of limitations had run. This Court affirmed. *F.E.B. Corp.*, 818 F.3d at 693.

10

In doing so, this Court considered and rejected an argument that is functionally the same, if not quite identical, to the argument F.E.B. makes in this appeal. In that case, F.E.B. "contend[ed] that, although the QTA's limitations period may have been triggered in 1951, the period did not expire, because the intervening passage of the SLA countervailed the United States' 1951 assertion of ownership." *Id. a*t 687. F.E.B. argued that the Submerged Lands Act "abandoned the federal government's previously-expressed claim to the (formerly submerged) Wisteria Island, which in turn effectively reset the QTA's statute of limitations period for that island." *Id.* at 688. This Court noted the rule that "the federal government cannot abandon property absent an affirmative act authorized by Congress," *id.* (quoting *Int'l Aircraft Recovery, LLC v. Unidentified, Wrecked & Abandoned Aircraft*, 218 F.3d 1255, 1258 (11th Cir. 2000)), and that there can be no abandonment unless the United States "clearly and unequivocally abandons its interest," 818 F.3d at 688 (internal quotation marks and citation omitted).  The Court then held:

> The SLA only "release[d] and relinquishe[d]" the United States'
> interest in submerged lands "except as otherwise reserved [t]herein."
> 43 U.S.C. § 1311(b). One such reservation excepts from the SLA "*all
> lands filled in, built up, or otherwise reclaimed by the United States
> for its own use.*" *Id.* § 1313(a) (emphasis added). Wisteria Island's
> origin is undisputed: It was built up by Navy contractors, who *used
> the land for the government's purpose and benefit of storing fill
> accumulated from nearby dredging operations*. Thus, the plain
> language of the SLA refutes F.E.B.'s argument that the SLA clearly

and unequivocally conveyed title in Wisteria Island to the neighboring
state of Florida.

*Id.* at 688-89 (second emphasis added).

This Court then specifically rejected F.E.B.'s argument that "the exception
does not apply because the United States did not build up or fill in the island 'for
its own use,' 43 U.S.C. § 1313(a)." *Id.* at 689. This Court first reiterated the rule
that "[i]t is well-established . . . that grants of federal property are construed strictly
in favor of the United States." *Id.* This Court then held that given that "rule of
construction, the circumstances of Wisteria Island's creation hew closely enough to
the 'for its own use' exception to the SLA to preclude a finding that the SLA
clearly and unequivocally abandoned the federal government's interest in that
island." *Id.*

F.E.B. attempts to cast aside this Court's interpretation of the Submerged
Lands Act as applied to Wisteria Island as "dicta." Opening Brief 12-14. But the
Court's statements applying the Submerged Lands Act to Wisteria Island are not
dicta. As this Court has explained, "dicta is defined as those portions of an opinion
that are 'not necessary to deciding the case then before us,' whereas holding is
comprised both of the result of the case and 'those portions of the opinion
necessary to that result by which we are bound.'" *Powell v. Thomas*, 643 F.3d
1300, 1304-05 (11th Cir. 2011) (quoting *United States v. Kaley*, 579 F.3d 1246,
1253 n.10 (11th Cir. 2009)).

The issue in *F.E.B. Corp.* was whether the Submerged Lands Act "clearly and unequivocally" abandoned the United States interest in Wisteria Island. 818 F.3d at 689. To decide that issue, it was necessary to decide whether Wisteria Island fell within the Act's exception for lands the United States filled in or built up for its own use. If so, then the Submerged Lands Act did not abandon the United States previous claim to title, and the Quiet Title Act's statute of limitations had run; if not, then the Submerged Lands Act did abandon that previous claim, and the Quiet Title Act's statute of limitations did not preclude suit. It was in that context that this Court concluded that Wisteria Island was "built up by Navy contractors, who used the land for the government's purpose and benefit of storing fill accumulated from nearby dredging operations." 818 F.3d at 688-89. That conclusion was a necessary part of the Court's ultimate holding that the United States did not clearly and unequivocally abandon its interest in Wisteria Island through the Submerged Lands Act and is therefore a "portion[] of the opinion necessary to that result" by which this Court is "bound." *Powell*, 643 F.3d 1304-05.

It is true that this Court noted in *F.E.B. Corp.* that its holding did not "dispositively rule on the merits of F.E.B.'s SLA claim, including as to whether using the island as a place to store fill constitutes 'use' under the relevant SLA exception." 818 F.3d at 689. But that is not because its statements about that

13

exception were unnecessary to its decision and were therefore dicta, but instead because the court lacked jurisdiction to rule dispositively on the title dispute where the Quiet Title Act's statute of limitations had expired. *Id.* The Court was therefore required to leave the ultimate question for another day, but that does not transform the holding of *F.E.B. Corp.* into mere dicta.

The holding of *F.E.B. Corp.* is therefore that the Submerged Lands Act does not clearly and unequivocally abandon the United States interest in Wisteria Island for purposes of the Quiet Title Act's statute of limitations, because the Navy built up the island "for the government's purpose and benefit of storing fill accumulated from nearby dredging operations." 818 F.3d at 688-89. The question in this case is whether the Submerged Lands Act, "construed strictly in favor of the United States" and with any "doubts . . . resolved" in its favor, conveyed in "clear language" Wisteria Island to Florida. *California II*, 457 U.S. at 287; *Union Pac. R.R. Co.*, 353 U.S. at 116. There may be theoretical space between the Submerged Lands Act "clearly and unequivocally" abandoning the United States' claim and the same statute, when "construed strictly in favor of the United States," conveying in "clear language," with doubts resolved in the United Sates' favor, the United States' title, but it is surely not enough space to justify a different result here. This Court should affirm.

F.E.B. also suggests that this Court's prior opinion did not consider evidence about Wisteria Island that is present in the current record. Opening Brief at 16. It is not clear, though, to what evidence F.E.B. is referring, as it cites to pages 33-38 of its brief, which is the section on legislative history. This Court considered the legislative history in its *F.E.B.* opinion. *See* 818 F.3d at 689 n.9. The only other document F.E.B. cites is a Navy's District Public Works Officer letter that post-dates passage of the Submerged Lands Act. Opening Brief at 16, 36-37; R-38:Ex. 23. But that document merely says that it was unclear "whether or not it was the intention of the Navy to use the island after it was created," R-38:Ex. 23, which is not materially different from the evidence that this Court considered in *F.E.B. Corp. See* 818 F.3d at 690 (considering, among other similar documents, a "memo by the Chief of the Bureau of Yards and Docks to the Chief of Naval Operations" opining that "'[i]t would appear that the Navy would have a difficult time in proving that this island was built up for Federal use'"). The document cited by F.E.B. here therefore does nothing to call into question this Court's conclusion in *F.E.B. Corp*. that storing the fill to create the island was itself using the lands. F.E.B. cannot escape the force of this Court's decision in *F.E.B. Corp.* on the basis of a supposed difference in the records.

15

**B.**     **Plain language, Supreme Court case law, and legislative history each reinforce the conclusion that when Congress passed the Submerged Lands Act, the United States retained title to Wisteria Island.**

The debate about dicta aside, this Court reached the right result in *F.E.B. Corp.*, and its analysis is persuasive. First, the facts of this case fall squarely within the plain language of the Submerged Lands Act's exception for lands filled in or built up by the United States for its own use. It is undisputed that the United States used the lands that now constitute Wisteria Island as a spoil location during the 1940s dredging of Key West Harbor. When the United States engages in a dredging project, it must identify a location for storing the resulting spoil. Here, Wisteria Island was created by the United States as a spoil storage site during the 1940s dredge project, which the United States conducted for its own military use. R.15:4-5; Case No.12-10072—R59-1:22 (Bernstein Deposition); Case No.12-10072—R.63-1:7-9 (Toppino Deposition).

Courts have concluded in other contexts that using land for spoil storage is a "use" of the land, for purposes of federal law. *See*, *e.g.*, *St. John United Church of Christ v. Federal Aviation Administration*, 550 F.3d 1168, 1173-74 (D.C. Cir. 2008) ("spoil storage" is a "land use" that is "reasonably connected" to the construction of an airport runway); *Chackal v. United States*, No. 07-80723-CIV, 2008 WL 5056509, *4 (S.D. Fla. Nov. 21, 2008) (holding that an existing easement grants the United States "the right to use the land in any way to preserve

16

and maintain the" Intracoastal Waterway, which includes "excavating the land, using the land as a staging area or *storing [dredge] materials on the site*) (emphasis added). Using the land in that way filled it in and built it up to create Wisteria Island. Accordingly, the undisputed evidence in this case establishes that by using the land that now constitutes Wisteria Island as a spoil location during a dredging project conducted by and for the United States, the United States filled up and built in Wisteria Island for its own use.

F.E.B. contends that the Submerged Lands Act should not be read in that way because the Act grants to the states "all filled in, made, or reclaimed lands which formerly were lands beneath navigable waters." 43 U.S.C. § 1301(a)(3); Opening Brief at 31-33. Thus, according to F.E.B., the mere act of using the lands to store fill and thereby building up the lands is not enough to constitute a "use" under the Submerged Lands Act's exception, but instead the act of building the land up must be done for some other, *future* use. *Id.* at 12, 31-33. But the word "future" appears nowhere in the statute and there is no cause for this Court to add it. As the district court concluded, the Submerged Lands Act is "clear on its face, and does not include a future-use requirement." R-67:7.

And reading the exception to cover lands used by the United States to store fill resulting from dredging conducted to benefit the Navy would not, as F.E.B. suggests, read section 1301(a)(3) out of the statute. Instead, as the district court

recognized, the phrase "for its own use" distinguishes lands filled in or built up by the United States for the benefit of the federal government from lands filled in or built up for the benefit of a state or private party. R-67:8. Thus, for example, section 1301(a)(3) would convey formerly submerged lands that were filled in or built up for state or private use, even if done under the auspices of a federal permit or authorization, with federal funding, or even by the federal government itself. *See*, *e.g.*, Rivers and Harbors Act of 1899, 33 U.S.C. §§ 403, 408. Here, though, the only entity for whose use Wisteria Island was built up was the United States Navy.

Second, as this Court previously concluded, reading the plain language of the Submerged Lands Act exception to cover Wisteria Island is consistent with the only Supreme Court opinion to examine that exception. As this Court explained in *F.E.B. Corp.*, the conclusion that storage of spoil results in land filled up for the United States' own use "comports with the Supreme Court's only treatment of the exception." *Id.* (citing *California II*, 457 U.S. at 287). This Court went on to explain:

> In *California [II]*, the Supreme Court stated in dicta that the SLA exception for land built up by the United States "for its own use" would apply to coastline that had slowly accreted after the United States constructed jetties nearby, even though the accretion was inadvertent, and the resulting coastline had remained barren and unused for the first eighty years of its existence. *Id.* at 275–76, 287, 102 S.Ct. 2432. That result, the Supreme Court reasoned, "follow[ed] from the congressional object to assure each sovereign the continuing

18

benefit of landfill and like work performed by each." *Id.* at 287, 102
S.Ct. 2432. Wisteria Island surely was both created and used for a
more functional purpose than the inadvertent accretions at issue in
*California [II]*.

*Id.* at 689-90 (emphasis added and internal footnotes omitted).

In *California II*, "[t]he issue before the Court [was] the ownership of

oceanfront land created through accretion to land owned by the United States on

the coast of California." 457 U.S. at 275. In the late 1800s, the United States

created two jetties at the entrance of a bay. *Id.* "The jetty construction . . . resulted

in fairly rapid accretion on the ocean side of the Coast Guard Reservation, so that

formerly submerged lands became uplands." *Id.* The 184 acres of upland created

by the accretion remained barren for more than eighty years. *Id.* at 276. In 1977, a

controversy arose "when the Coast Guard applied for permission from California

to use this land to construct [a] watchtower." *Id.* After the Coast Guard applied for

permission to use the land, "it became evident that both California and the United

States asserted ownership of the land." *Id.*

California argued "that the United States expressly surrendered title to the

disputed land through the Submerged Lands Act" because "but for the construction

of the jetties, the subject land would have remained submerged." *Id.* at 286. The

Supreme Court disagreed. First, the Court did not read § 1301(a)(3) of the

Submerged Lands Act to apply to uplands gradually formed through accretion. *Id.*

at 287. The Court then noted that "to the extent that the accretions are to be

considered 'made' land, they would fall within the reservation by the United States of 'all lands filled in, built up, or otherwise reclaimed by the United States for its own use.' This follows from the congressional object to assure each sovereign the continuing benefit of landfill and like work performed by each." *Id.* at 287.

Under that test, Wisteria Island is land that was "filled in, built up, or otherwise reclaimed by the United States for its own use." 43 U.S.C. § 1313(a). It is undisputed that Wisteria Island was created by the United States during dredge projects undertaken by the United States for naval use. If accretion that occurs inadvertently as a result of a jetty being built by and for the United States qualifies as lands "filled in, built up, or otherwise reclaimed by the United States for its own use," then there is no doubt that land created by the intentional storing of dredge spoil in the course of a project done by and for the United States is also land that is "filled in, built up, or otherwise reclaimed by the United States for its own use." *See*, *e.g.*, *F.E.B. Corp.*, 818 F.3d at 690 ("Wisteria Island surely was both created and used for a more functional purpose than the inadvertent accretions at issue in *California [II]*.").

Finally, the Submerged Lands Act's legislative history provides further support for the conclusion that Wisteria Island was excepted from the Act. The exception at issue here was requested by the Secretary of the Navy and the Attorney General, and fill at the naval station in Key West, Florida (of which

Wisteria Island was a part) was mentioned specifically in doing so. In response to a request for a list of locations and improvements that should be excepted from the Submerged Lands Act, the Secretary of the Navy sent to Congress a "[l]ist of improvements made by the Navy at naval activities in which the improvements have been added beyond the mean low water and into the marginal sea." R.1-30:549-50. The list identifies "Key West (naval station), Fla." as one of 8 locations with improvements that should be excepted and identifies "[f]ill" as one of the improvements at "Key West (naval station), Fla." to be excepted from the Act. *Id.* at 550.

Similarly, on March 2, 1953, Attorney General Herbert Brownell, Jr. testified before the Senate Committee. R.1-32. In response to a request from the Senate for language that would "clearly protect[] any installations the Federal Government might have, such as the ones that were mentioned the other day by the Secretary of the Navy," Attorney General Brownell offered language that included the filled in, built up, or otherwise reclaimed land exception. R.1-32:935. That was the first time the filled in, built up, or otherwise reclaimed land exception appeared in the legislative history, and nearly identical language was included in the final version of the Act. 43 U.S.C. § 1301 et seq.

According to Attorney General Brownell's testimony, the filled in, built up, or otherwise reclaimed land exception was added to the legislation in order to

21

"make certain that all installations by the States on submerged, reclaimed, or filled or other lands inside the line, belong to the States subject to the navigation servitude; also that all installations and acquisitions of the Federal Government within such area belong to it." R.1-32. In other words, as recognized by the Supreme Court, the filled in, built up, or otherwise reclaimed land exception was added to the Submerged Lands Act to "assure each sovereign the continuing benefit of landfill and like work performed by each." *California II*, 457 U.S. at 287.

In *F.E.B. Corp.*, this Court agreed that the conclusion that Wisteria Island was retained by the United States "is consistent with the SLA's legislative history, which shows that Congress added the exception in response to the Navy's concern that the SLA would strip it of submerged lands that it had 'improved.'" 818 F.3d at 689 n.9 (citing Submerged Lands: Hearings on S.J. Res. 13, S. 294, S. 107, S. 107 Amend. Before the S. Comm. on Interior and Insular Affairs, 83rd Cong. 544–556 (1953) (statement of Robert B. Anderson, Secretary of the Navy)). As this Court concluded then, "[t]he Navy specifically listed 'fill' as one of the 'improvements' at Key West Naval Station that it sought to shield from the SLA." *Id.*

The Submerged Lands Act's legislative history thus makes clear that Congress intended to except Wisteria Island from the operation of the Act. Wisteria Island was the result of "landfill and like work performed by" the United

States, was part of "Key West (naval station), Fla.," and was improved with fill on or before 1953. (F.E.B.'s suggestion that "landfill" in this context means garbage dump, Opening Brief at 14, serves only to highlight the weakness of its argument). Accordingly, Wisteria Island did not pass to Florida under operation of the Submerged Lands Act, and the United States has maintained continued, uninterrupted ownership of Wisteria Island.

F.E.B. contends, however, that the legislative history supports its reading of the Submerged Lands Act. Opening Brief at 33-38. According to F.E.B., the exception was added to the Submerged Lands Act only to protect improved military shore instillations built on fill and in active use. *Id.* at 36. Of course, none of that characterization of the Act appears in the language of the Act itself. And the very legislative history that F.E.B. relies on identifies, as this Court has already recognized, that fill itself is an improvement. 818 F.3d at 689 n.9 (noting that "[t]he Navy specifically listed 'fill' as one of the 'improvements' at Key West Naval Station that it sought to shield from the SLA").

F.E.B. makes one last argument about the Submerged Lands Act in relation to Wisteria Island. F.E.B. contends that Navy statements made after passage of the Act show that the Navy had no intended future use for Wisteria Island. Opening Brief at 38-45. Of course, that argument assumes the correctness of F.E.B.'s premise that some intention for future use is required, which, as we have

explained, is not a requirement present in the Submerged Lands Act. F.E.B.'s arguments can be disregarded on that basis alone.

Regardless, F.E.B.'s arguments are incorrect. The Navy asserted ownership of the island when Florida attempted to sell it, and the most that the statements F.E.B. cites show is that the Navy concluded after passage of the Submerged Lands Act that it would be difficult to prove a specific post-filling use of the island. What some Navy officials stated in internal memos about the appropriate interpretation of the Submerged Lands Act, a statute the Navy is not charged with administering, does not shed any light on the proper interpretation of the Act.

This Court should affirm the district court's judgment.

## II.    The district court did not abuse its discretion by striking F.E.B.'s improper expert reports on statutory interpretation.

F.E.B. contends that it was error for the district court to strike the expert reports of Bryan Garner, Barry Schein, and (to the extent it offered legal conclusions) Michael Finkbeiner. Those reports, as F.E.B. admits, offered opinions on the proper interpretation of the Submerged Lands Act. It is well established that opinions on legal questions are impermissible, and F.E.B. cites no case where any similar expert report was admitted. The district court did not err by striking those reports.

There can be no doubt that Garner and Schein offer expert opinion on a question of statutory interpretation. They say so themselves. R.38-44:2-3 ("The

question posed to me is the meaning of the phrase 'all land filled in, built up, or otherwise reclaimed by the United States for its own use.'") (quoting 43 U.S.C. § 1313(a)); R.38-45:1 (Schein "retained as an expert to interpret sections of the Submerged Lands Act pertinent to an island mass, Wisteria Island, created by the placement of dredge materials."). Finkbeiner similarly opines in parts of his report on the meaning of terms contained within the Submerged Lands Act, on how to interpret the Act and its legislative history, and on whether the Wisteria Island is excepted from the operation of the Act under his construction of that statute. R.38-46:28-29, 49, 66, 80-81, 82-83, 84-88, 88-95.

"Questions of statutory interpretation are pure questions of law." *Snapp v. Unlimited Concepts, Inc.*, 208 F.3d 928, 932–33 (11th Cir. 2000) (citing *Caro–Galvan v. Curtis Richardson, Inc.*, 993 F.2d 1500, 1504 (11th Cir.1993). "Questions of law are not subject to expert testimony." *Commodores Entm't Corp. v. McClary*, 879 F.3d 1114, 1128-29 (11th Cir. 2018); *see also In re Lynch*, 755 F. App'x 920, 925 (11th Cir. 2018), cert. denied sub nom. *Lynch v. Deutsche Bank Nat. Tr. Co.*, 139 S. Ct. 2624 (2019). "In our legal system, purely legal questions . . . are exclusively the domain of the judge." *United States v. Mikutowicz*, 365 F.3d 65, 73 n.4 (1st Cir. 2004) (quoting *Nieves–Villanueva v. Soto–Rivera*, 133 F.3d 92, 99 (1st Cir.1997) (internal alterations accepted); *Dahlgren v. Muldrow*, No. 106CV00065MPAK, 2008 WL 186641, at *5 (N.D.

Fla. Jan. 18, 2008) ("The determination of which law applies and what the law means is for the Court to decide.").

In *Commodores* this Court emphasized the impropriety of expert testimony on questions of law in the context of jury trials. 879 F.3d 1114, 1128-29. And in *Lynch*, though unpublished, this Court rejected similar expert testimony on legal questions offered to a judge. *In re Lynch*, 755 F. App'x at 929. This Court affirmed the district court's order affirming the bankruptcy court's grant of summary judgment in favor of a bank seeking to enforce a mortgage lien. *Id*. One of the issues raised on appeal in *Lynch* was whether the bankruptcy court improperly failed to credit, at the summary judgment stage, an expert report produced by the debtor. *Id.* at 925. The expert report sought to offer an opinion on the legal insufficiency of the loan under the Uniform Commercial Code in light of the facts of that case. "That, however, is a legal conclusion," and since "questions of law are not subject to expert testimony," this Court held that the bankruptcy court "did not abuse its discretion by choosing not to credit [the debtor's] purported expert report." *Id.* Similarly, in this case, the Garner Report and Schein Report, in their entirety, and the Finkbeiner Report, to the extent it opines on the meaning and application of the Submerged Lands Act, offer impermissible legal conclusions in the guise of expert opinions and, therefore, were correctly disregarded by the district court.

In *Lind v. International Paper Company*, 2014 WL 11332304 (W.D. Tex. 2014), the district court excluded the expert testimony of Bryan A. Garner— presumably the same Bryan A. Garner retained by F.E.B. in this litigation —for the exact same reason his expert report was correctly stricken in this case: he sought to provide an opinion on a question of law. *Lind*, 2014 WL 11332304 at *1. In *Lind*, Garner sought to offer an expert opinion in the form of a grammatical interpretation of a bonus provision of an agreement. *Id.* at *2. The court held that Garner's expert opinion should be excluded because it is "based on the law or on legal conclusions." *Id.* The district court here correctly reached the same result.

The cases making this point are legion. "The district court's responsibility to serve as the singular source of law require[s] it to be vigilant about the admissibility of legal conclusions from an expert witness." *Commodores Entm't Corp.*, 879 F.3d at 1129. "Expert testimony proffered solely to establish the meaning of a law is presumptively improper." *Mikutowicz*, 365 F.3d at 73 (quoting *United States v. Prigmore*, 243 F.3d 1, 18 n. 3 (1st Cir.2001)); *Frye v. Hamilton Cty. Hosp.*, No. 18-CV-3031-CJW-MAR, 2019 WL 2404330, at *4 (N.D. Iowa June 7, 2019) ("It is well established that an expert cannot offer an opinion that defendant violated a statute."); *Bacchi v. Mass. Mut. Life Ins. Co.*, No. 12-CV-11280-DJC, 2016 WL 1170958, at *2 (D. Mass. Mar. 23, 2016) ("Accordingly, 'expert testimony proffered solely to establish the meaning of a law is

27

presumptively improper.'") (quoting *Bartlett v. Mut. Pharm. Co.*, 742 F. Supp. 2d 182, 188 (D.N.H. 2010) (internal alterations accepted); *Dahlgren*, 2008 WL 186641, at *5 ("Regardless of whether a witness is a lay witness or an expert witness, all witnesses generally are prohibited from testifying as to questions of law regarding the interpretation of a statute, the meaning of terms in a statute, or the legality of conduct."); 66 A.L.R.5th 135 ("Courts traditionally have restricted the use of expert testimony to factual, as opposed to legal, questions. Courts have historically refused to admit testimony explaining matters of domestic law, including statutory and regulatory law."). Accordingly, "[e]xpert opinion regarding what the law is or how it applies to the facts of the case may be stricken." *Bacchi*, 2016 WL 1170958, at *2 (citing *Karp v. CIGNA Healthcare, Inc.*, 882 F. Supp. 2d 199, 205 n.4 (D. Mass. 2012); *Bartlett*, 742 F. Supp. 2d at 188).

F.E.B. goes to great lengths to establish that courts often consider the works of experts like Garner and Schein. But while the Court may consult and cite to an expert's treatise or work in answering a legal question, a party may not bring the expert in to offer an opinion on a legal question. Just because Garner is repeatedly quoted in cases as an author of legal works, including a book he co-authored with Justice Antonin Scalia, *see e.g.*, *McCarthan v. Director of Goodwill Industries-Suncoast, Inc.*, 851 F.3d 1076, 1127 (11th Cir. 2017) (Rosenbaum, dissenting), does not mean that he is entitled to submit expert testimony on behalf of a party to

28

express an opinion on a legal question in a particular case. F.E.B. cites no case, and we have found none, where Garner has been permitted to offer expert opinions. In fact, in at least two cases where Garner was offered as an expert, his opinions were excluded. *See Diamondback Indus., Inc. v. Repeat Precision, LLC*, No. 6:19-CV-00034-ADA, 2019 WL 7761432, at *1 (W.D. Tex. Aug. 20, 2019); *Lind*, 2014 WL 11332304, at *2. And it is not just Garner. While F.E.B. repeatedly implies that expert opinions on the meaning and application of a statute are permissible, F.E.B. fails to identify or cite to a single case that permitted an expert opinion on a question of statutory interpretation.

F.E.B.'s citation to, and reliance upon, *District of Columbia v. Heller*, 554 U.S. 570 (2008), is similarly misguided. It is true that "*Heller* is replete with reliance on treatise, commentaries, and dictionaries." Opening Brief at 24. Citing to "treatise, commentaries, and dictionaries" is a practice that courts have adopted and engaged in for years and is a known and proper use of those sources. But that does not mean that the authors of those works may be allowed to appear as experts in particular cases to offer opinions on questions of law. As another district court has persuasively explained:

> In our adversarial system, lawyers make arguments, judges write legal opinions—and there is no such thing as an expert opinion when it comes to interpreting a statute unless that opinion belongs to a court. [Purported experts] are free to consult with the moving defendants, sign their brief, or both. They may attend the conferences and argue on their behalf. They [can] submit[] an amicus brief arguing how the

29

> law should be interpreted . . . . But it remains this Court's exclusive
> duty and province "to say what the law is."

*In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 69–70 (S.D.N.Y. 2001)

(quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)) (emphasis

added). That is all that *Heller* stands for. In *Heller*, the Supreme Court considered

arguments made in an amicus brief. The amicus brief is not an expert opinion, and

the Supreme Court did not treat it as such. The brief merely contained arguments

made by its author. If Garner or Schein want to file an amicus brief in this or any

other case, they are free to seek permission to do so. But they cannot be qualified

as experts to give legal opinions, and the district court correctly excluded their

reports.

## III.    The district court correctly denied F.E.B.'s motion under Rules 59(e) and Rule 60.

Finally, F.E.B. contends that the district court should not have granted

judgment on all 39 acres of Wisteria Island because only 20 of them would fall

within the "for its own use" exception even under the district court's reading of the

Act. Opening Brief at 45-48. That argument was raised only after final judgment in

a motion filed under Rules 59(e) and 60. R-77. The district court concluded that

F.E.B. had abandoned the argument and that it would fail on the merits in any

event. R-86.

The district court did not abuse its discretion. As the district court concluded, neither Rule 59(e) nor Rule 60(b) are appropriate vehicles by which to raise arguments that could have been raised earlier. R-86:3 (citing *Michael Linet, Inc. v. Vill. of Wellington, Fla.*, 408 F.3d 757, 763 (11th Cir. 2005) and *Gonzalez v. Sec'y for Dep't of Corr.*, 366 F.3d 1253, 1291-92 (11th Cir. 2004) (Tjoflat, J. concurring in part)). Here, F.E.B. not only failed to adequately raise the argument, it affirmatively placed the full 39 acres at issue at summary judgment. R-87:4-5. F.E.B. offers no argument on appeal to contradict the district court's conclusion that F.E.B. did not adequately raise at summary judgment the argument in now seeks to raise. The district court therefore did not abuse its discretion in denying F.E.B.'s motion, and its order doing so should be affirmed.

Regardless, the district court also correctly denied the motion on the merits of the argument. The Submerged Lands Act does not require that excepted lands be filled in or built up above sea level; instead, it expressly states that "*all lands* filled in, built up, or otherwise reclaimed by the United States for its own use" are excepted from the operation of the statue. 43 U.S.C. § 1313(a) (emphasis added). "All lands" includes lands below sea level. Accordingly, in this case, any land that had spoil placed on it during the 1940s dredge project, and that continued to have the character of "filled in" or "built up" land at the time the Submerged Lands Act

was enacted—even if the land remained below sea level after the completion of the project—is excepted from the Submerged Lands Act.

F.E.B.'s conclusory argument that only the land above sea level is land that was "filled in" or "built up" is incongruous and not supported by evidence. Not only does this conclusory argument fail to recognize that fill can be, and, in this case, was, placed on land beneath sea level thereby elevating its depths, but also that, in elevating land that was once anywhere from 3 to 7 feet beneath sea level (as established by all the Navigation Charts in evidence in this case) to above sea level, the fill will fall down into the surrounding submerged lands around the above-sea-level land, which will leave the surrounding submerged lands "built up." Even F.E.B.'s own expert observed "[i]t appears that the discharge area was not walled off to help contain the discharge" on top of the mound. R.38-13.

Thus, as the district court concluded, "the statute does not contain the distinction" that F.E.B. raised in its motion. The district court correctly denied the motion. This Court should affirm.

## CONCLUSION

For the foregoing reasons, this Court should affirm.

Respectfully submitted,

/s/ *Michael T. Gray*
TODD KIM
*Assistant Attorney General*
MICHAEL T. GRAY
*Attorney*
Environment and Natural Resources Division
U.S. Department of Justice
701 San Marco Blvd.
Jacksonville, FL 32207
(202) 532-3147
michael.gray2@usdoj.gov

September 1, 2021
90-1-5-16367

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 7,928 words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ *Michael T. Gray*
MICHAEL T. GRAY

Counsel for Appellees